UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HICHAM ABOUTAAM,<br><br>                    Plaintiff,<br><br>          -*against*-<br><br>AHMAD EL ASSAAD and PRIDE INVESTS<br>SAL,<br><br>                    Defendants. | 18 CV 08995 (ALC)<br><br>**AMENDED COMPLAINT**<br><br>Plaintiffs Demand<br>Trial by Jury |

Hicham Aboutaam, by and through his attorneys, Emery Celli Brinckerhoff & Abady

LLP, for his Amended Complaint against Ahmad El Assaad alleges as follows:

**NATURE OF THE ACTION**

1.      This action seeks damages for three fraudulent schemes (a charity and two real

estate developments) and a declaration that the defendant, Ahmad El Assaad, is bound to the

terms of the settlement he offered to Hicham Aboutaam, and that Mr. Aboutaam accepted.

2.      For ten years, Mr. El Assaad tried to gain Mr. Aboutaam's trust and persuade him

to support various philanthropic and business ventures. These projects included a US-based

Lebanese children's charity, a Lebanese housing development (Pride Invests SAL), and a US-

based business selling real estate in the south of France. But each of these efforts was wrecked

by Mr. El Assaad's broken promises: the charity foundered under concerns it was a front for Mr.

El Assaad's political ambitions, the Lebanese apartment was neither as described nor finished on

time, and there was no land in the south of France to develop.

3.      In the face of these mounting concerns, Mr. Aboutaam tried to cut his ties to Mr.

El Assaad. He demanded the return of his $810,000 investment in the Lebanese apartment

complex. Mr. El Assaad initially refused. Then, after threatened litigation, Mr. El Assaad

relented: he proposed in writing a settlement requiring him to return $800,000 of Mr.

Aboutaam's $810,000 investment in two installments, in December 2018 and April 2019. In the

interests of resolving their dispute, on June 18, 2018, Mr. Aboutaam agreed. He sent a text

message to Mr. El Assaad to confirm their agreement in writing. Then Mr. El Assaad promptly

broke his word, again. Repudiating their agreement, Mr. El Assaad has attempted to re-negotiate

the settlement. But the June 18, 2018 agreement is valid and enforceable.

4.      Mr. Aboutaam now seeks to recover the funds he lost contributing to Mr. El

Assaad's charity, purchasing his apartment, and investing in his development business. He also

seeks a declaration that his settlement with Mr. El Assaad is binding.

## PARTIES

5.      Hicham Aboutaam is co-founder of Phoenix Ancient Art, a private art gallery

based in Geneva, Switzerland and the owner of Electrum, an art gallery in New York. He is a

citizen of New York, New York.

6.      Ahmad El Assaad, on information and belief, is a real estate developer. He also

holds himself out as the Founder and Chairman of a Lebanese political party called the Lebanese

Option Party. On information and belief, he is a citizen of Beirut, Lebanon.

7.      Pride Invests SAL is, on information and belief, a citizen of Lebanon with its

principal place of business at Hazmiyeh, Mar Tecla, La Diva Building, Lebanon. Pride Invests

SAL conducts business in New York through its Chairman, Ahmad El Assaad.

## JURISDICTION AND VENUE

8.      This Complaint was initially filed in New York Supreme Court because, as a

court of general jurisdiction, that court has subject matter jurisdiction over, and is competent to

adjudicate, the causes of action set forth in this Complaint. The New York Supreme Court also had jurisdiction pursuant to Article 30 of the New York State Civil Practice Laws and Rules § 3001 to grant declaratory relief.

9.    Mr. El Assaad, after being served with and received, within the meaning of 28 U.S.C. § 1446, a copy of the summons with notice on September 6, 2018 and a copy of the complaint on September 26, 2018, removed this matter to this Court on the grounds of diversity. Dkt. 1.

10.    As set forth in Mr. El Assaad's Notice of Removal with regard to the first complaint, this Court "has diversity jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 in that the matter in controversy is between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."

11.    This Court also has diversity jurisdiction over Pride Invest SAL for the same reasons as it has diversity jurisdiction over Mr. Aboutaam's dispute with Mr. El Assaad.

## FACTS

12.    Hicham Aboutaam first met Ahmad El Assaad about ten years ago in New York. Then, as now, Mr. Aboutaam was an art dealer with a gallery on the Upper East Side of Manhattan. Mr. El Assaad was introduced to Mr. Aboutaam as an American-educated Lebanese businessman. Mr. El Assaad's principal business was real estate development. He aspired but failed to become a member of the Lebanese parliament in elections in 2009 and 2018.

**Mr. El Assaad Convinces Plaintiff to Support his Children's Charity**

13.    To support his political ambition, Mr. El Assaad organized fundraising events in 2008 in both Houston and New York. Despite these efforts, Mr. El Assaad was unsuccessful in

raising substantial funds.

14.    When his attempts to raise money for his political campaign foundered, Mr. El Assaad turned his attention to raising money for a United States-based charity he had helped found in 2011 with the stated aim of aiding children in impoverished areas of Lebanon. He called the 501(c)(3) organization "Saving the Next Generation," or "SNG."

15.    Mr. El Assaad told Mr. Aboutaam on dozens of occaisions from 2012 to 2014—in personal meetings, telephone calls, meals, and at public events—that SNG's mission was "to revitalize and encourage Lebanese youth to become world citizens and ambassadors for a modern, progressive Lebanon." This quote was false, and was prepared by Mr. El Assaad and published on SNG's website. SNG's website also has an organizational "timeline" that begins in 2011 with the claimed success of enrolling "500 children to participate in 19 weekend camps and 60 day trips." The timeline then goes on to list milestones of increased participation in its programming through 2013, before listing aspirational goals for 2014 and 2020. Today, SNG lists no realized milestones after 2013. Mr. El Assaad orchestrated, edited, and approved SNG's public statements in its promotional materials that promoted its false and misleading mission.

16.    Mr. El Assaad asked Mr. Aboutaam to help him raise money for SNG in New York. Mr. El Assaad told Mr. Aboutaam that the money that was given to SNG would be used to support that organization's stated mission. Mr. El Assaad made these statements repeatedly to Mr. Aboutaam in the course of their conversations about SNG. In these communications, Mr. El Assaad described SNG as "the mission of my life, I don't need it for my [political] party." He stated, "I spent $3 million from my personal money per year on these kids just to see how fun life [can be]." He claimed to need "more funds because we [SNG] are expanding and sending

kids to universities." He emphasized that "There is nothing political about SNG, it's more important than my party." None of these statements were true at the time they were made.

17.    These statements were made throughout the time that Mr. El Assaad worked with Mr. Aboutaam on the SNG project. For example:

    a.  On July 22, 2012 from 10:30 a.m. to 3:30 p.m., Mr. Aboutaam attended an SNG retreat with Mr. El Assaad and his wife, Abir, on Travers Island at the New York Athletic Club in Pelham, New York. When Mr. Abouttam argued that it would be improper to have any political affiliation for SNG, Mr. El Assaad stated that "the contributions will not have any relationships to my politics." He also committed at the same meeting to revise a promotional DVD for SNG to eliminate references to politics.

    b.  On Oct 24, 2012 at 8:00 p.m., at Orsay Restaurant in New York City Mr. Aboutaam met with Mr. El Assaad to discuss SNG. At this dinner, Mr. El Assaad again committed that SNG was separate from his political ambitions and they discussed the second iteration of the related SNG promotional DVD. Similar conversations—with similar commitments about the apolitcal purpose of SNG—proceeded in other New York restaurants on February 25, 2014 at Tomate Rouge at 1:00 p.m.; on November 8, 2014 at Orsay Restaurant at 7:15 p.m.; on June 7, 2015 at Ilili at 8 pm; on October 18, 2015 at Naya Restaurant at 7:30 pm; on March 12, 2016 at the Astoria Clock at the Waldorf Astoria; and later that night at the Four Seasons restaurant at 9:00 p.m.

    c.  On Nov 11, 2014, Mr. El Assaad met with Mr. Aboutaam to discuss a proposal by a potential SNG donor to include impoverished Palestinian

children in refugee camps. Mr. El Assaad rejected this idea and indicated that

he only wanted to support Lebanese children. When Mr. Aboutaam suggested

that this position could be construed to reflect that SNG had a political

agenda—which Mr. Aboutaam thought was improper—Mr. El Assaad

repeated his categorical denial of any relationship between his political party

and SNG.

18.    At the time Mr. El Assaad made these statements about SNG's independence of

politics, he knew they were false. Mr. El Assaad made these false statements to induce Mr.

Aboutaam and others to invest in SNG. Mr. El Assaad intended to use the funds he raised from

Mr. Aboutaam and other United States donors—not to support SNG's mission—but to support

his political ambitions.

19.    Mr. El Assaad's silence in the face of others' statements that SNG would be

independent from politics and his political party (the Lebanese Option Party) was also

fraudulent. For example, in an email sent by Marcie Gantz from SNG to Mr. Aboutaam, Mr. El

Assaad, and others on June 28, 2012, Ms. Gantz reported back from a meeting with a major

donor prospect that "[h]e was happy to hear that SNG is separate from LOY [referring to the

Lebanese Option Party]." "This [SNG] should not be connected to any politics," she wrote. Mr.

El Assaad did not write to correct the misimpression that SNG was independent from his

political party.

20.    Mr. Aboutaam trusted Mr. El Assaad and believed his false representations that

SNG funds would not be used to support his political ambitions. He relied on those false

representations when he decided to support SNG himself with both direct donations and by

helping Mr. El Assaad put together several high-profile fund-raising events that were hosted at

the Metropolitan Museum of Art (on July 27, 2012) and the Yale Club (on May 21, 2014). Through these events and his contacts in New York, Mr. Aboutaam helped raise money for Mr. El Assaad's charity.

21.    In addition, Mr. Aboutaam made contributions of his own to SNG that exceeded $30,000 in both direct donations and in the donation of artwork for auction at the Yale Club on May 21, 2014.

22.    Mr. Aboutaam's contributions to SNG were made in reliance on the false statements that Mr. El Assaad made to Mr. Aboutaam that the SNG funds would be used to support SNG's mission.

**Mr. El Assaad Persuades Plaintiff to Invest in Lebanese Real Estate**

23.    Having established a relationship with Mr. Aboutaam through his philanthropic efforts purportedly on behalf of SNG, Mr. El Assaad set out to convince Mr. Aboutaam to invest in his speculative real estate ventures. Mr. El Assaad's first pitch was a development he called "Magnolia." As an art dealer, Mr. Aboutaam had no real estate investment experience, but he agreed to meet with Mr. El Assaad to discuss his proposal.

24.    In or around April 2015, in the living room of his suite at the Waldorf Astoria Hotel in New York, Mr. El Assaad presented Mr. Aboutaam with what he referred to as the crown jewel of his real estate business: a luxury apartment development in a mountainous area called Yarzeh, Lebanon. Mr. El Assaad described each unit in the development as a "town house." He prepared large binders with colorful detailed brochures, blue prints, and other marketing materials, including exclusively produced DVDs with renderings of each lavish apartment and happy actors posing as occupants. Mr. El Assaad proudly played the DVD during their meeting and gave the materials to Mr. Aboutaam. Mr. El Assaad emphasized, among other

things, the unobstructed, sunset views from the property and showed pictures to Mr. Aboutaam illustrating this feature.

25.     Mr. El Assaad explained his concept was to develop a new luxury real estate market in Yarzeh. Mr. El Assaad claimed that he was pitching his development to several other United States citizens, including a prominent Lebanese-American businessman and major donor to SNG, and that he would personally have an apartment in the complex, because it was the best building and best location in the whole country. The main selling points were, in addition to the high standard of the construction, the impeccable view and the quiet neighborhood.

26.     At the time he made this presentation to Mr. Aboutaam, Mr. El Assaad knew these representations about the view and the details about the isolated, quiet location of the property were false. Mr. El Assaad made these false statements to induce Mr. El Assaad to enter into an agreement to purchase property in the Magnolia development.

27.     Initially, Mr. Aboutaam told Mr. El Assaad that he had no interest in purchasing real estate in Lebanon. Mr. Aboutaam explained that the last time he had visited the country was during the summer of 2006, when his family was traumatized by the devastating war while they awaited evacuation to Cyprus by the United States Marines. But Mr. El Assaad would not take no for an answer. He pressed Mr. Aboutaam to invest and argued he was offering a great opportunity to buy preconstruction real estate in a secluded and quiet mountain area with clear, unmatched sunset views, and that this was a rare opportunity to obtain one of the apartments before they sold out. Mr. El Assaad emphasized that the opportunity was so incredible that he was getting an apartment himself in the same building and would transfer his engineering office to the underground floor.

28.     Ultimately, Mr. Aboutaam relented—but only on the condition that he could recover his investment if he chose to withdraw from the development.

29.     Based on Mr. El Assaad's fraudulent misrepresentations about the nature of the property, Mr. El Assaad and Mr. Aboutaam entered into a Sale Agreement on June 25, 2015 (the "Sale Agreement") wherein Mr. Aboutaam committed to pay $810,000 for an apartment at the Magnolia. Mr. El Assaad used the corporate entity Pride Invests SAL—of which he claimed to be the chairman—as the counterparty for the transaction. The Sale Agreement provided that Mr. El Assaad would "immediately return to [Mr. Aboutaam] all sums paid by him without any compensations or commissions" if Mr. Aboutaam decided to revoke his investment.

**Mr. El Assaad Prevails on Plaintiff to Co-Found a Company to Sell French Real Estate**

30.     In the middle of 2016, Mr. El Assaad expanded his business connections with Mr. Aboutaam by proposing that the two enter into a partnership to promote a new real estate project—selling villas and apartments that Mr. El Assaad claimed to be developing in the south of France, in Mougins, Cannes and Theoule Sur Mer, which were once heavily promoted on prideofcotedazur.com but no longer appear there.

31.     Mr. El Assaad met with Mr. Aboutaam in Toronto, Canada on August 10 and 11, 2016 to discuss Mr. El Assaad's real estate business proposal.

32.     Mr. Assaad had arranged the meeting with a friendly and insistent email imploring Mr. Aboutaam to come to Canada to meet him because he missed Mr. Aboutaam. He said that Mr. Aboutaam could be with him and his son and daughter who were on vacation with him. Mr. Aboutaam flew to Toronto on August 10 and stayed in the same hotel with Mr. El Assaad, the InterContinental. Over the course two days, including two dinners, Mr. El Assaad convinced Mr. Aboutaam of his grand plan which would later be revealed as another scam.

33.    Mr. El Assaad began his pitch by telling Mr. Aboutaam that he had never partnered with anyone in his life before but that he trusted Mr. Aboutaam and wanted to partner with him to realize his vision for selling American clients property in the south of France and eventually in New York.

34.    Mr. El Assaad told Mr. Aboutaam that they would "split expenses" and that their US company would keep 10% of the proceeds after expenses. Mr. El Assaad detailed how he would make the prices competitive and how his villas and apartments would successfully target American buyers, particularly in the northeast. He described specific features that he claimed would appeal to Americans that are unusual to find in French properties, such as air conditioning and American-style kitchens.

35.    Mr. El Assaad told Mr. Aboutaam that he expected to sell $20 million in property the first year and that sales would grow from there. Mr. El Assaad claimed that following this guaranteed success in France, he would start developing real estate in New York and invest more money and that he wanted Mr. Aboutaam to identify property for him to buy in the United States.

36.    Mr. El Assaad told Mr. Aboutaam that he had already purchased two pieces of property in the south of France and would be buying more. He explained that he was already getting the building licenses and his architects were finalizing the plans. Mr. El Assaad invited Mr. Aboutaam to travel to the property and meet the architects.

**Mr. El Assaad Choreographs a Deceptive Trip to Cannes**

37.    Two months later, in October 2016, Mr. Aboutaam agreed to Mr. El Assaad's invitation and travelled to France where Mr. El Assaad continued to present the elaborate, fraudulent scheme.

38.     While in France, Mr. El Assaad showed Mr. Aboutaam architects' drawings for the project. On information and belief, these drawings were either fabricated or plagiarized from the website of the architect Jose Tauzia. Mr. Aboutaam was also taken to visit lands Mr. El Assaad claimed to have purchased by a private chauffeur who was hired for the occasion. Mr. El Assaad explained in detail how the digging would take place, the different views of the units, and took Mr. Aboutaam for lunch at a local restaurant.

39.     The next day Mr. El Assaad drove Mr. Aboutaam in a brand new convertible Rolls Royce that he had picked up at the dealership in Monaco where Mr. El Assaad claimed to be purchasing the car. They also toured other potential lands to be purchased accompanied by real estate brokers, while Mr. El Assaad's driver followed them in a Mercedes. Mr. Aboutaam was hosted in Cannes in a villa that Mr. El Assaad described as his own but Mr. Aboutaam later discovered was rented.

40.     Mr. Aboutaam came to learn that the entire Cannes visit was a staged attempt to convince Mr. Aboutaam to invest his time and money in Mr. El Assaad's scheme. Contrary to Mr. El Assaad's elaborate presentation, Mr. El Assaad had no property to sell in France.

41.     Mr. El Assaad named the business "Pride of Cote d'Azur Realty LLC," consistent with the names of some of his other ventures under his "Pride Invests " umbrella. From the outset, Mr. El Assaad told Mr. Aboutaam that his objective was to sell $50 million of property to investors in the United States, starting with $20 million in the first year. He also repeated his representation that he would share expenses and profits from this business with Mr. Aboutaam. But at the time Mr. El Assaad made these statements, he had no intention of sharing expenses with Mr. Aboutaam and he did not own the property he claimed to own in France.

42.    Mr. El Assaad's strategy was to collect multiple down payments and have the funds wired to Lebanon. Mr. El Assaad represented that Jose Tauzia was a star architect who would design the project. He described Mr. Tauzia as "world famous" and boasted that Mr. Tauzia had designed the $30 million villa of the emir of Qatar in the south of France.

43.    Mr. Aboutaam relied on Mr. El Assaad's false representations that he owned property in France and that he would share expenses with Mr. Aboutaam when he decided to go into business with Mr. El Assaad.

44.    The parties entered into a limited liability company agreement to create Pride of Cote d'Azur Realty LLC, a Delaware company, as of December 1, 2016. The Agreement named Plaintiff and Defendant as members, with each owning a 50% interest in the company. The Agreement provided that "the Company's profits and losses shall be allocated to the Members according to their Percentage Interests." At the time Mr. El Assaad entered into this agreement, he never intended to share the expenses of the business with Mr. Aboutaam.

45.    Pride of Cote d'Azur's business plan called for potential home buyers to provide down payments on pre-construction properties in the south of France that were to be built on land that Mr. El Assaad claimed he already owned. Mr. El Assaad's office in Cannes, France produced pamphlets with digital renderings of the villas and his office in Lebanon constructed a large, luxurious 3D model of the villas, which was to be used as a marketing tool.

46.    After entering into their agreement, Mr. Aboutaam followed Mr. El Assaad's instructions and leadership regarding what he thought was an honest business. The parties entered a lease for the Company on February 15, 2017 for an office at 60 East 66th Street, Suite 5A. The lease was for 62 months at an average of $6,320 each month. Mr. El Assaad's share of the five-year rental fees was $145,360.

47.     From the start of the business, Mr. Aboutaam insisted that the company should start construction, or at least digging, so that the members could present something more than digital images to the potential buyers. Mr. El Assaad never agreed. Instead, Mr. El Assaad used the architectural models and tried to promote the development through additional digital renderings on his website.

48.     Over time, it appeared that Mr. El Assaad had no intention of building anything. He seemed to be simply planning to collect down payments for buildings and villas. Whenever Mr. Aboutaam confronted Mr. El Assaad with these concerns, Mr. El Assaad managed to persuade him that this approach was industry standard.

49.     In the end, Mr. El Assaad never built any of the properties he promised in the south of France, nor did he apparently ever purchase the three different plots of land he advertised in Mougins, Cannes, and Theoule Sur Mer. All information relating to these properties, including videos, renderings, measurements, and prices have been deleted from his website.

**As Mr. El Assaad's Ventures Fail, Mr. Aboutaam Withdraws His Investment**

50.     By the spring of 2018, Mr. Aboutaam was confronted with the full reality of Mr. El Assaad's manipulations: his political failures destroyed SNG, he refused to return the apartment investment, and he refused to share in the costs of the failing French real estate business.

51.     Mr. Aboutaam had become aware of several concerning signs from several of Mr. El Assaad's investors who had become disillusioned with his schemes. One serious donor to SNG who had been approached to buy property in Magnolia and in France refused.  Another early donor to Mr. El Assaad had bad experiences with him and had urged other potential donors

not to donate. Another SNG board member had expressed concerns about the political

connections of the organization. And one of SNG's former presidents who had raised similar

concerns resigned from the organization after hearing reports from SNG's public relations

representative who had visited SNG's camp in Lebanon.

52.     Information arose that suggests Mr. El Assaad, who was the seed donor to SNG,

abused his position of power with the charity to funnel funds intended to support Lebanese

children to underwrite Mr. El Assaad's failing political efforts. The camp was filled with his

political party's logos and flags, the staffers were from his political party, and his wife, who held

a major position in SNG, also was Youth Chancellor at the Lebanese Option Party from 2010

and was herself a failed candidate to the Lebanese parliament in 2018. Based on multiple reports

from people with personal knowledge of SNG's operations, the camp and donations intended to

promote SNG were used to support the image of Mr. El Assaad's political organization. Some

suspected that Mr. El Assaad had taken those funds to use them for his political activities while

also promoting SNG as a platform to try to solicit the votes of the impoverished student

participants and their families.

53.     Mr. El Assaad acknowledged that his prime interest in SNG had been politics

when he wrote to Mr. Aboutaam on May 12, 2018 after his loss in the Lebanese elections. "I

have decided to downsize my activities in Politics as well as in SNG," Mr. El Assaad wrote.

"Can you imagine that some of the University Students that I have been sponsoring for years,

had the audacity to help my opponents in this [sic] elections???"

54.     Once Mr. Aboutaam became concerned about the use of SNG funds, he tried to

research what other information might be available about Mr. El Assaad. Using an Arabic

keyboard to search for Mr. El Assaad's name, Mr. Aboutaam found an article on an Arabic

website that examined the use of SNG funds and concluded that they had been used to support other real estate projects.  The article concludes: "As for the political money to support the 'Saving The Next Generation' case story, a well-informed source tells me that it went to the following gutters: Properties purchased as 'Ahmed Al Assaad & Sons' in 2010 under the name: Pride Investment." A translation of the article is attached as Exhibit A.

55.    The French real estate venture was faring no better. Despite the efforts of its principals, Pride of Cote d'Azur never managed to sell anything. But the business continued to accrue expenses in New York, including its lease of office space. Mr. Aboutaam tried but could not find a sublessor for the property, even at a loss at $4,800 per month.

56.    In April 2018, Mr. El Assaad's share of the company's outstanding debts was $24,776 and the company was continuing to incur additional expenses like rent, utilities, property insurance, bank fees, and late fees, without any income. When Mr. Aboutaam asked Mr. El Assaad to contribute capital to cover the company's mounting debts, Mr. El Assaad responded on April 27, 2018 and stated: "I am extremely busy with the elections. Will look into it during the week of May 7." He never made the outstanding payment. In another email dated May 12, 2018, Mr. El Assaad wrote: "As for our small adventure in New York, I kindly ask you to close the company and to take care of the losses yourself."

57.    Finally, during a visit to Lebanon in November 2017, Mr. Aboutaam learned that Mr. El Assaad had not managed to sell a single apartment in the Magnolia complex, and many of them remained unbuilt. Moreover, the apartment that Mr. Aboutaam had purchased had views that were blocked by a tower immediately facing the development. And the view that was supposed to be unobstructed was marred by gigantic quarters of the Lebanese Ministry of Defense. The promised quiet and tranquil first-floor apartment and its terrace were on a two-way

street routinely filled with cars awaiting a major Lebanese army check point. It was clear the images emailed to Mr. Aboutaam were staged. They were shot by a drone, according to one of his employees, and placed in the air above the building to show the sunset and the sea. But, contrary to these misleading images, the building is almost entirely shaded from the sun.

58.     Mr. El Assaad had also repeated many times that, due to the exclusivity of Yarzeh, no one would be able to buy land and build there. He claimed that he had been able to charm an older lady into selling him her unique property and that she would not have sold to anyone else. But when Mr. Aboutaam visited the site in himself, he was able to see a number of newly constructed buildings with billboards describing their details and phone numbers to contact. Most of these buildings had views that were more direct and unobstructed than those provided by the Magnolia development.

59.     As his concerns mounted, Mr. Aboutaam terminated the Sales Agreement for the Magnolia property in writing to Mr. El Assaad by email on May 21, 2018. In the same message, Mr. Aboutaam demanded the return of his investment of $810,000, and he provided Mr. El Assaad a grace period until May 31, 2018 to comply.

60.     When Mr. El Assaad did not comply with Mr. Aboutaam's demand, Mr. Aboutaam retained counsel who wrote to Mr. El Assaad on May 23, 2018 to seek recovery of the $810,000 investment.

**After Reaching a Settlement, Mr. El Assaad Tries to Change its Terms**

61.     After a course of negotiations, Mr. El Assaad sent Mr. Aboutaam a text on June 3, 2018 that proposed he would "pay you $400k in December of this year and another 400k in April of 2019" to resolve their dispute. The two men then exchanged several other texts concerning the details of the settlement in an attempt to flesh out the terms. Then, on June 16, Mr. El Assaad

responded, rejected the intermediate efforts for additional terms, and reaffirmed the basic

elements of his proposal. "What you are suggesting is simply ridiculous," he began with

reference to their intermediate discussions, "I will honor what I said. If that is not enough for

you, then I have nothing else to say."

62.    Mr. Aboutaam responded in a text to Mr. El Assaad on June 18, 2018 and

accepted his offer of settlement, stating:

> If there has been some misunderstanding, I apologize. I am trying
> to make sure we have an agreement that we both can count on. But
> most of all, I want to work with you to bring this matter to an end.
> To that end, I accept your proposal, with kateb el-adel [notary],
> that you make two payments to me in December 2018, and April
> 2019, in equal amounts of $400k. So, at this point, we have a deal
> for repayment on the terms you specified.

This settlement—the "June 18 Agreement"—compromised the immediate payment of the

outstanding $810,000 with a two-payment structure of $800,000. Mr. Aboutaam considered this

writing a binding resolution of their dispute.  Mr. El Assaad responded that he would "get back

to you next week once I am back in Beruit."

63.    Mr. El Assaad then sent Mr. Aboutaam a revised agreement containing new

material terms that had previously never been discussed, including the right to demand an

additional $120,000 if the apartment was not sold. These additional terms demonstrated a

disregard for the previously-agreed settlement.

### FIRST CAUSE OF ACTION
### (Fraud—SNG)

64.    Plaintiff repeats and re-alleges the allegations contained in the foregoing

paragraphs as if fully set forth herein.

65.    Mr. El Assaad's representations that donations to SNG would be spent to support

a charity to aid children in Lebanon were false and malicious at the time they were made. Mr. El

Assaad made these misrepresentations with the intent to persuade Mr. Aboutaam and others to invest in SNG. Mr. El Assaad caused the monies donated to the SNG charity to be spent elsewhere, including to support his own political ambitions.

66.    Mr. Aboutaam was damaged by these false representations because he made donations to SNG reasonably relying on these misstatements.

67.    Mr. El Assaad is liable to Mr. Aboutaam for the value of all donations Mr. Aboutaam made to SNG in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement—Magnolia Apartment)

68.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

69.    Mr. El Assaad's representations on behalf of Pride Invests SAL concerning the nature of the location and view and the uniqueness of the Magnolia property development were false and malicious. Mr. El Assaad knew those representations were false at the time he made them.

70.    Mr. El Assaad's false representations were made to induce Mr. Aboutaam to enter into the June 25, 2015 Sale Agreement with Pride Invests SAL to purchase real estate.

71.    Mr. Aboutaam made payments of $810,000 to purchase the fraudulent real estate in reasonable reliance on Mr. El Assaad's false representations on behalf of Pride Invests SAL.

72.    Accordingly, Mr. Aboutaam seeks rescission of the June 25, 2015 Sale Agreement and disgorgement of all monies paid to Mr. El Assaad and Pride Invests SAL relating to the Magnolia investment, together with prejudgment and post judgment interest in an amount not less than $810,000, to be determined at trial.

### THIRD CAUSE OF ACTION
### (Fraud—Pride of Cote d'Azur)

73.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.    Mr. El Assaad's representations that he would develop real estate in the south of France were false and malicious. He never had any intention to develop real estate in France and, contrary to his representations, he never owned the three plots of land to develop the real estate, either.

75.    Mr. El Assaad's false representations were made to induce Mr. Aboutaam to expend his own funds to support Mr. El Assaad's attempts to lure investors to Mr. El Assaad's scheme. When that real estate scheme failed, Mr. El Assaad tried to force Mr. Aboutaam to incur 100% of the related business costs.

76.    Mr. Aboutaam made payments to support Pride of Cote d'Azur in reasonable reliance on Mr. El Assaad's false representations.

77.    Accordingly, Mr. Aboutaam seeks reimbursement of all monies paid in support of Pride of Cote d'Azur and reimbursement for all current expenses of the business, including rent for the remainder of the lease, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

78.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

79.    The June 18 Agreement is a valid, binding, and enforceable agreement.

80.    Mr. El Assaad has attempted to repudiate the June 18 Agreement by forwarding a draft settlement with additional, extraneous terms.

81.     Mr. Aboutaam has no adequate remedy at law to ensure compliance with the June 18 Settlement.

82.     Mr. Aboutaam seeks a declaration, pursuant to CPLR 3001, that the June 18 Settlement is enforceable.

83.     No prior application for the relief requested herein has been made.

## FIFTH CAUSE OF ACTION
### (Breach of the June 18 Agreement)

84.     Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.     The June 18 Agreement is a valid, binding, and enforceable agreement.

86.     Mr. El Assaad offered in writing to settle a dispute with Mr. Aboutaam over $810,000 by making two installments of $400,000 to Mr. Aboutaam in December 2018 and April 2019.

87.     Mr. Aboutaam accepted Mr. El Assaad's offer of settlement in writing on June 18, 2018.

88.     Among other things, Mr. Aboutaam's willingness to accept less than $810,000 was consideration for the June 18, 2018 Agreement.

89.     Mr. El Assaad's refusal to make payment to Mr. Aboutaam under the terms of the June 18 Agreement violates the terms of that agreement.

90.     Mr. Aboutaam has been damaged by Mr. El Assaad's breach of the June 18 Agreement.

WHEREFORE, Plaintiff respectfully requests that the Court grant it the following relief:

A.    Damages in an amount to be determined at trial;

B.    A declaration that the June 18 Agreement is enforceable; and

C.    Any such other and further relief as this Court deems just, proper and equitable,

together with the costs, fees, and attorneys' fees of this proceeding.

Dated: New York, New York            EMERY CELLI BRINCKERHOFF
        January 11, 2018                 & ABADY LLP

                                         By: _____
                                            Richard D. Emery
                                            O. Andrew F. Wilson
                                          600 Fifth Avenue, 10th Floor
                                          New York, NY 10020
                                          (212) 763-5000

                                        *Attorneys for Plaintiff*