UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HICHAM ABOUTAAM,

                    Plaintiff,

     -against-

AHMAD EL ASSAAD and PRIDE INVESTS
SAL,

                   Defendants.

18 CV 8995 (ALC) (KHP)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-500

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ...................................................................................ii-v

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ........................................................................................................2

ARGUMENT ..............................................................................................................6

     I.     THE SETTLEMENT IS ENFORCEABLE AND IT WAS BREACHED.............6

          A.     Mr. El Assaad Offers to Settle ..................................................................7

          B.     Mr. Aboutaam Accepts Mr. El Assaad's Offer...........................................8

          C.     Mr. Aboutaam Provided Consideration ....................................................8

          D.     Mr. El Assaad Breached the Settlement Agreement...................................9

     II.     THIS COURT HAS JURISDICTION OVER THE AMENDED COMPLAINT ................................................................................................10

          A.     The Settlement Agreement is a Separate and Enforceable Contract .........10

          B.     The Settlement Agreement Did Not Incorporate the Sales Agreement.....12

          C.     This Court Has Personal Jurisdiction over Mr. El Assaad For All Claims............................................................................................13

     III.     THE MOTION TO DISMISS THE AMENDED COMPLAINT FAILS .............14

          A.     The Amended Complaint Sufficiently Pleads Fraud Regarding SNG.......15

          B.     The Amended Complaint Pleads Fraud Regarding Pride of Cote d'Azur ..........................................................................................17

          C.     The Amended Complaint Pleads Fraud Relating to the Magnolia ...........20

CONCLUSION..........................................................................................................24

## TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Adams v. Boston Properties Ltd. P'ship*,
  41 A.D.3d 112 (1st Dep't 2007) ..................................................................... 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)........................................................................................ 14

*Babaev v. Grossman*,
  No. 03 CV 5076, 2007 WL 633990 (E.D.N.Y. Feb. 26, 2007) ........................ 23

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
  171 F.3d 779 (2d Cir. 1999)............................................................................ 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ 14

*Blue Ridge Farms, Inc. v. Crown Equip. Corp.*,
  No. 01 Civ. 8460, 2005 WL 755756 (E.D.N.Y. Mar. 28, 2005) ..................... 21

*Broder v. Cablevision Sys. Corp.*,
  329 F. Supp. 2d 551 (S.D.N.Y. 2004), *aff'd*, 418 F.3d 187 (2d Cir. 2005) ................. 7, 10

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)............................................................................ 24

*Della Rocco v. City of Schenectady*,
  278 A.D.2d 628 (3d Dep't 2000) ...................................................................... 9

*Doehla v. Wathne Ltd., Inc.*,
  No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999) ........................ 20

*Dornberger v. Metro. Life Ins. Co.*,
  961 F. Supp. 506 (S.D.N.Y. 1997)................................................................... 18

*Friedman v. Pesach*,
  160 A.D.2d 460 (1st Dep't 1990) ..................................................................... 7

*Fung-Schwartz v. Cerner Corp.*,
  No. 17 Civ. 233, 2019 WL 4393022 (S.D.N.Y. Sept. 13, 2019) ..................... 15

*Hargrave v. Oki Nursery, Inc.*,
  636 F.2d 897 (2d Cir. 1980)............................................................................ 13

*Idearc Media LLC v. Siegel, Kelleher & Kahn LLP*,
    No. 09 Civ. 1090S, 2012 WL 162563 (W.D.N.Y. Jan. 18, 2012) ................................... 19

*Jack v. Strang*,
    No. 13 Civ. 5713, 2014 WL 4652596 (S.D.N.Y. Sept. 18, 2014) ................................... 13

Kassner v. 2nd Ave. Delicatessen Inc.,
    496 F.3d 229 (2d Cir. 2007) ............................................................................................. 2

*Keywell Corp. v. Weinstein*,
    33 F.3d 159 (2d Cir. 1994) ............................................................................................. 22

*Kidd v. Spector*,
    No. 93 Civ. 7297, 1998 WL 879698 (S.D.N.Y. Dec. 15, 1998) ..................................... 21

*Kokkonen v. Guardian Life Ins. Co. of America*,
    511 U.S. 375 (1994) .............................................................................................. 9, 11, 12

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
    108 F.3d 1531 (2d Cir. 1997) ......................................................................................... 21

*Lopez v. Jet Blue Airways*,
    662 F.3d 593 (2d Cir. 2011) ........................................................................................... 14

*M&T Mortg. Corp. v. Miller*,
    323 F. Supp. 2d 405 (E.D.N.Y. 2004) ........................................................................... 18

*Maines Paper & Good Serv., Inc. v. Keystone Assocs.*,
    134 A.D.3d 1340 (3d Dep't 2015) ................................................................................. 12

*Mareno v. Rowe*,
    910 F.2d 1043 (2d Cir. 1990) ......................................................................................... 13

*Mayo v. Fed. Gov't*,
    558 F. App'x 55 (2d Cir. 2014) ..................................................................................... 24

*Mfrs. Hanover Trust Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993) ............................................................................................... 21

*N.Y. Land Improvement Co. v. Chapman*,
    118 N.Y. 288 (1890) ....................................................................................................... 23

*Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*,
    723 F.3d 192 (2d Cir. 2013) ........................................................................................... 14

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018) ........................................................................... 20

*O-AT-KA Milk Prods. Co-op, Inc. v. TIC Gums, Inc.*,
  No. 13 Civ. 6347, 2014 WL 7215188 (W.D.N.Y. Dec. 17, 2014) ................................... 9

*Ogunsaya v. Langmuir*,
  No. 08 Civ. 940, 2008 WL 4426590 (E.D.N.Y. Sept. 26, 2008)..................................... 19

*Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.*,
  880 F. Supp. 96 (N.D.N.Y. 1995)................................................................................... 22

*Petrello v. White*,
  412 F. Supp. 2d 215 (E.D.N.Y. 2006) ........................................................................... 23

*Point Devs., Inc. v. Fed. Deposit Ins. Corp.*,
  921 F. Supp. 1014 (E.D.N.Y. 1996) ............................................................................... 9

*Polycast Tech, Corp. v. Uniroyal, Inc.*,
  728 F. Supp. 926 (S.D.N.Y. 1989)................................................................................. 15

*Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*,
  138 F. Supp. 3d 303 (S.D.N.Y. 2014)............................................................................ 24

*Roman Y Gordillo, S.C. v. Bank of N.Y. Mellon Corp.*,
  No. 12 Civ. 212, 2014 WL 3507300 (S.D.N.Y. July 14, 2014) ................................... 12

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)........................................................................................... 24

*S. J. Capelin Assocs., Inc. v. Globe Mfg. Corp.*,
  34 N.Y.2d 338 (1974) ..................................................................................................... 7

*Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*,
  156 F. Supp. 3d 348 (E.D.N.Y. 2016) ........................................................................... 14

*Saunders v. Morton*,
  No. 5:09 Civ. 125, 2011 WL 1135132 (D. Vt. Feb. 7, 2011),
  *report and recommendation adopted*, 2011 WL 1114416 (D. Vt. Mar. 24, 2011) .......... 17

*Sawabeh Info. Servs. Co. v. Brody*,
  832 F. Supp. 2d 280 (S.D.N.Y. 2011)............................................................................ 18

*Scott v. JPMorgan Chase & Co.*,
  No. 13 Civ. 646, 2014 WL 338753 (S.D.N.Y. Jan. 30, 2014)........................................ 11

*Standard Sec. Life Ins. Co. of N.Y. v. Berard*,
  684 F. App'x 56 (2d Cir. 2017) ..................................................................................... 22

*Starmark, Inc. v. Zaccaria*,
  No. 91 Civ. 2764 (JFK), 1992 WL 209288 (S.D.N.Y. Aug. 17, 1992)........................... 15

*Stevens v. Publicis, S.A.*,
    50 A.D.3d 253 (1st Dep't 2008) ............................................................ 9

*Town of Wallkill v. Tesa Tape Inc.*,
    982 F. Supp. 300 (S.D.N.Y. 1997) ........................................................ 13

*U.S. Steel Corp. v. Turner Constr. Co.*,
    560 F. Supp. 871 (S.D.N.Y. 1983) ........................................................ 12

*United States ex rel. Forcier v. Computer Sci. Corp.*,
    183 F. Supp. 3d 510 (S.D.N.Y. 2016) .................................................. 15

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196 (2d Cir. 2001) .................................................................. 13

*Wilson v. Thorn Energy, LLC*,
    787 F. Supp. 2d 286 (S.D.N.Y. 2011) .................................................. 16

*Woodrock Contracting Co. v. Young*,
    283 A.D. 307 (1st Dep't 1954) .............................................................. 11

**Statutes and Rules**

CPLR 302(3) ............................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ..................................................................... 14, 24

Fed. R. Civ. P. 9(b) ................................................................................... 15

## PRELIMINARY STATEMENT

Words matter. A deal is a deal. Ahmad El Assaad understood these principles. He knew when he offered in writing to settle his dispute with his partner, Hicham Aboutaam, that his offer was binding. He expected that Mr. Aboutaam would rely on his promise. And he intended to be bound by it. When Mr. Aboutaam suggested other terms, Mr. El Assaad rejected them. "I will honour what I said," he replied. Mr. Aboutaam accepted. The acceptance of Mr. El Assaad's offer created a binding agreement. The written exchange between these business partners is a paradigmatic example of contract formation. And it is indisputable.

Summary judgment should be granted because there is no dispute of fact concerning the elements of the settlement formation: (1) Mr. El Assaad promised to honor his offer to settle his dispute with two payments of $400,000; (2) Mr. Aboutaam accepted that offer; and (3) in consideration, Mr. Aboutaam agreed to forgo litigation and be paid less money on a slower schedule than he was entitled. Each of these elements is established in the black and white of a text message exchange that binds both parties; each element is fortified by Mr. El Assaad's deposition testimony and Mr. Aboutaam's declaration.

This Court has jurisdiction to declare the settlement enforceable and enforcement of the settlement effectively ends this dispute.

In addition to enforcing the parties' settlement, the Court should also deny Mr. El Assaad's motion to dismiss. The Amended Complaint sets forth, in elaborate detail, allegations regarding three different frauds concerning a charity, an apartment, and a real estate business. On a motion to dismiss, these facts are taken as true. The Amended Complaint's specific allegations are more than adequate to make out claims for fraud and breach of the parties' new settlement agreement.

1

## BACKGROUND

The settlement at the heart of this case resolved disputes that had festered for a decade. For ten years, Defendant Ahmad El Assaad sought and obtained investments from Plaintiff Hicham Aboutaam under false pretenses. Am Compl. ¶ 2.[1]

### *Mr. El Assaad Fraudulently Induces Mr. Aboutaam to Invest in Saving the Next Generation*

In the beginning, it was a charity. Soon after they met, Mr. El Assaad asked Mr. Aboutaam to donate to the nonprofit Mr. El Assaad had founded, Saving the Next Generation ("SNG"). Mr. El Assaad repeatedly promised "[t]here is nothing political about SNG." *Id.* ¶¶ 15-16. On July 22, 2012, between 10:30 a.m. and 3:30 p.m., Mr. El Assaad reiterated to Mr. Aboutaam that "contributions [to SNG] will not have any relationships to my politics" at a retreat in Pelham, New York. *Id.* ¶ 17(a). Again, on October 24, 2012, at 8:00 p.m., Mr. El Assaad assured Mr. Aboutaam that "SNG was separate from his political ambitions" at a restaurant in New York City. *Id.* ¶ 17(b). When Mr. Aboutaam questioned whether SNG's decision about a proposal could be construed as political on November 11, 2014, Mr. El Assaad "repeated his categorical denial of any relationship between his political party and SNG." *Id.* ¶ 17(c). Based on these promises, Mr. Aboutaam gave his time and money to SNG. *Id.* ¶¶ 20-21.

But all these assurances were false. *Id.* ¶ 18. In fact, Mr. El Assaad funneled funds from SNG to support his own political efforts; used the donations to fill the SNG camp with his party's logos and flags; and paid members of his own political party to serve as staffers. *Id.* ¶ 52.

---

[1]     For facts relevant to Mr. El Assaad's motion to dismiss, citations are made to allegations in the Amended Complaint, all of which are taken as true. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). For facts relevant to Mr. Aboutaam's motion for summary judgment, citations are to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("56.1 ¶ _"), the Declaration of Hicham Aboutaam ("Aboutaam Decl."), and the transcript of the deposition of Ahmad El Assaad, October 30, 2019 ("El Assaad Dep.") which is attached as Exhibit 1 to the Declaration of Richard D. Emery in Support of Plaintiff's Motion for Partial Summary Judgment.

Mr. El Assaad used SNG "as a platform to try to solicit the votes of impoverished student participants and their families." *Id.* When he lost in the 2018 elections, Mr. El Assaad complained that SNG's students had the "audacity" to betray him and vote for the opposing party. *Id.* ¶ 53.

### Mr. El Assaad Fraudulently Induces Mr. Aboutaam to Invest in Magnolia

In addition to his charity, Mr. El Assaad convinced Mr. Aboutaam to invest in a real estate development called "Magnolia." *Id.* ¶ 23. In April 2015, at New York's Waldorf Astoria, Mr. El Assaad sold Mr. Aboutaam a vision of a luxury apartment development in Yarzeh, Lebanon. *Id.* ¶ 24. In his pitch, Mr. El Assaad promised that the Magnolia apartments would have "unobstructed, sunset views," *id.* ¶¶ 24, 26, and would be in a "secluded and quiet mountain area," *id.* ¶ 26. Mr. El Assaad also promised that "no one [else] would be able to buy land and build there." *Id.* ¶ 58. Based on Mr. El Assaad's promises and photos, Mr. Aboutaam invested $810,000 to purchase an apartment, but only on the condition that he could immediately demand repayment for any reason, at any time. *Id.* ¶¶ 28-29. The parties executed this agreement on June 25, 2015 (the "Sales Agreement"). *Id.* ¶ 29.

All of Mr. El Assaad's representations proved false, again. In November 2017, Mr. Aboutaam—having already timely fulfilled his obligation to invest $810,000—learned that the views from the Magnolia "were blocked by a tower immediately facing the development" and "marred by gigantic quarters of the Lebanese Ministry of Defense." *Id.* ¶ 57. The complex was located near an army checkpoint on a two-way street with traffic noise and congestion. *Id.* The complex had no sunset views at all: "the building is almost entirely shaded from the sun." *Id.* The images Mr. El Assaad had used in the pitch had been staged by shooting from a high angle using a drone. *Id.* Worse still, Mr. Aboutaam learned that Mr. El Assaad's development rights

were far from exclusive; during his November 2017 visit to Yarzeh, Mr. Aboutaam observed "a number of newly constructed buildings" with "views that were more direct and unobstructed than those provided by the Magnolia development." *Id.* ¶ 58. Mr. El Assaad was aware of all these issues and knew his representations about the views and isolation of the Magnolia were false when he made them. *Id.* ¶ 26.

### Mr. El Assaad Lies About A French Development

Mr. El Assaad's litany of lies was not over. At meetings on August 10, 2016 and August 11, 2016, Mr. El Assaad told Mr. Aboutaam that he was "developing [villas and apartments] in the south of France, in Mougins, Cannes and Theoule Sur Mer." *Id.* ¶ 30. He promised that "he had already purchased two pieces of property in the south of France and would be buying more." *Id.* ¶ 36. Mr. El Assaad spun tall tales about air conditioning and American-style kitchens that would be part of the development. *Id.* ¶ 34. He represented that the project was already substantially underway; Mr. El Assaad claimed "that he was already getting the building licenses and his architects were finalizing the plans." *Id.* ¶ 36. He invited Mr. Aboutaam to France in October 2016, where he showed Mr. Aboutaam fabricated or plagiarized architectural drawings. *Id.* ¶ 38. He took Mr. Aboutaam to visit the property he claimed to have purchased. *Id.* He beseeched Mr. Aboutaam to invest in the real estate company for the development, Pride of Cote d'Azur Realty ("Pride"), promising that "he would share expenses and profits from this business." *Id.* ¶ 41. Based on these representations, Mr. Aboutaam invested. *Id.* ¶ 44. The pair entered into a 62-month commercial lease for the company in New York on February 15, 2017, under which Mr. El Assaad was responsible for $145,360.00 over five years. *Id.* ¶ 46.

As time went on, however, Mr. El Assaad rebuffed Mr. Aboutaam's requests to start building townhouses for sale. *Id.* ¶ 47. In the end, Mr. El Assaad "never built any of the

properties he promised in the south of France." *Id.* ¶ 49. The reason? Despite Mr. El Assaad's lofty promises, he "did not own the property he claimed to own in France." *Id.* ¶ 41. By April 2018, Pride was going down in flames; Mr. El Assaad had not paid a penny of the $24,776.00 in expenses, including rent, that he owed as of January 11, 2019, *id.* ¶ 56, an amount that now exceeds $38,000. When Mr. Aboutaam asked Mr. El Assaad to honor his obligations, Mr. El Assaad refused; he "never made the outstanding payment," and told Mr. Aboutaam "to close the company and take care of the losses [himself]." *Id.*

### *Mr. Aboutaam Asks For Repayment; Mr. El Assaad Refuses*

As the truth of Mr. El Assaad's deceptions began to come to light, Mr. Aboutaam decided to pull out of his investments with Mr. El Assaad. On May 21, 2018, Mr. Aboutaam demanded the return of his $810,000 Magnolia deposit. *Id.* Although the Sales Agreement allowed him to demand immediate repayment for any or no reason, Mr. Aboutaam gave Mr. El Assaad a ten-day grace period—through May 31, 2018—to repay him. *Id.* Mr. El Assaad did not comply. *Id.* ¶ 60.

Mr. Aboutaam continued his efforts to reach an amicable resolution of his dispute with Mr. El Assaad. The two exchanged messages on the application WhatsApp over the course of the next few weeks about Mr. Aboutaam's demand. On June 1, 2018, Mr. El Assaad messaged Mr. Aboutaam and stated "If you want to solve the matter in a civil manner; [sic] let me know[.]" Aboutaam Decl. Ex. 1 at 1; 56.1 ¶ 13. Mr. Aboutaam responded, on June 2, 2018, that "of course I want to solve the matter in a civil manner." Aboutaam Decl. Ex. 1 at 1; 56.1 ¶ 15. Next, on June 3, 2018, Mr. El Assaad wrote: "Will pay you 400k in December of this year and another 400k in April of 2019." Aboutaam Decl. Ex. 1 at 1; 56.1 ¶ 1. This repayment offer afforded Mr. El Assaad three distinct advantages over his repayment obligations under the Sales Agreement: he would pay just $800,000 total, as opposed to $810,000; he would be given ten months to

make his payments, rather than immediately owing the full amount of his debt; and the opportunity to avoid costly litigation. Aboutaam Decl. Ex. 1 at 1; 56.1 ¶¶ 7, 17. On June 11, 2018, Mr. Aboutaam wrote back, noting that "I'm ok in general w[ith] your proposal but will send you thoughts in case of no payment in [D]ec 18, and April 19." Aboutaam Decl. Ex. 1 at 2.

Mr. Aboutaam suggested additional terms on June 15. Mr. El Assaad did not agree to the new terms, but he wrote back on the next day and reiterated his initial offer: "What you are suggesting is simply ridiculous," he began, referring to the new terms, but then he went on: "I will honour what I said. If this is not enough for you, then I have nothing else to say[.]" Aboutaam Decl. Ex. 1 at 5; 56.1 ¶ 3. Two days later, on June 18, 2018, Mr. Aboutaam accepted Mr. El Assaad's offer, writing "I accept your proposal, with kateb el-adel, that you make two payments to me in December 2018, and April 2019, in equal amounts of $400k." Aboutaam Decl. Ex. 1 at 7; 56.1 ¶ 4. But when the time came, Mr. El Assaad did not make the necessary payments in December 2018 or April 2019. Aboutaam Decl. ¶ 5-6.

## ARGUMENT

Summary judgment on the $800,000 settlement should be granted, the Court has jurisdiction, and the motion to dismiss should be denied.

## I.  THE SETTLEMENT IS ENFORCEABLE AND IT WAS BREACHED

The parties' correspondence from June 1, 2018 through June 18, 2018 establishes that Mr. Aboutaam and Mr. El Assaad entered into a valid and enforceable settlement (the "June 18 Agreement"). Mr. El Assaad's deposition, held on October 30, 2019, removes any doubt that he intended to be bound by that exchange:

> Q:   Mr. El Assaad, did you offer to settle your dispute with
>      Hicham Aboutaam for a payment of $400,000 in December
>      2018 and $400,000 in April 2019?
> A:   Yes, true, I did that in the beginning.

6

> Q:    [When] you told him you were willing to pay him $800,000
>        in two installments, you expected Mr. Aboutaam to believe
>        you, right?
> A:    Right.

El Assaad Dep. 6:21-25, 14:6-9. The absence of any dispute concerning the formation of the

parties' agreement commands summary judgment.

The criteria for summary judgment are familiar. "It is axiomatic that where there are no

genuine issues of material fact, summary judgment must be granted." *Friedman v. Pesach*, 160

A.D.2d 460, 460 (1st Dep't 1990). "On a motion for summary judgment the court is not to

determine credibility, but whether there exists a factual issue, or if arguably there is a genuine

issue of fact . . . . A shadowy semblance of an issue is not enough to defeat the motion." *S. J.

Capelin Assocs., Inc. v. Globe Mfg. Corp.*, 34 N.Y.2d 338, 341 (1974) (internal quotation marks

and citations omitted).

Here, the Court should grant partial summary judgment, declare the June 18 Agreement

enforceable, and find Defendants are in breach of that agreement. The parties' written

communications contain all the elements for the formation of a contract: offer acceptance, and

consideration. *See Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556 (S.D.N.Y.

2004), *aff'd*, 418 F.3d 187 (2d Cir. 2005).

### A.    Mr. El Assaad Offers to Settle

Mr. Aboutaam began settlement negotiations with a demand for repayment of his

$810,000. *See* 56.1 ¶¶ 11-12. Notwithstanding the acrimony, both parties sought to avoid

litigation and reach an out-of-court agreement. *Id.* ¶¶ 7-17."If you want to solve the matter in a

civil manner," Mr. El Assaad wrote, "let me know." Aboutaam Decl. Ex. 1 at 1; 56.1 ¶ 13. Mr.

Aboutaam replied: "of course I want to solve the matter in a civil manner." Aboutaam Decl. Ex.

1 at 1. Later, when discussing this exchange in his deposition, Mr. El Assaad testified that

intended to settle the dispute "[w]ithout having to go to courts." El Assaad Dep. at 12:10-13.

Mr. El Assaad made his initial offer on June 3, 2018: "Will pay you 400k in December of

this year and another 400k in April of 2019." Aboutaam Decl. Ex. 1 at 1; 56.1 ¶ 1. Twelve days

later, on June 15, 2018, Mr. Aboutaam made a counteroffer, proposing additional terms.

Aboutaam Decl. Ex. 1 at 3-5; 56.1 ¶ 2. The next day, Mr. El Assaad declined to add the new

terms, but he reaffirmed his June 1, 2018 offer, making clear that only his original terms were

acceptable: "What you are suggesting is simply ridiculous," he began. "I will honour what I said.

If this is not enough for you, then I have nothing else to say[.]" Aboutaam Decl. Ex. 1 at 5; 56.1

¶ 3. This second invocation of his offer—"I will honour what I said"—was a clear, written offer.

There is no dispute that it was made. Aboutaam Decl. Ex. 1 at 5; 56.1 ¶ 3.

### B.      Mr. Aboutaam Accepts Mr. El Assaad's Offer

On June 18, 2018, Mr. Aboutaam unequivocally accepted Mr. El Assaad's June 16, 2018

offer in writing. Aboutaam Decl. Ex. 1 at 7; 56.1 ¶ 4. This acceptance reflected the terms that

Mr. El Assaad had proposed on June 3, 2018, and again on June 16, 2018. Mr. El Assaad never

withdrew his offer, *see* El Assaad Dep. 17:22-25, 20:16-21; Aboutaam Decl. ¶¶ 21-22, and when

he responded to Mr. Aboutaam's message accepting his offer, he did not assert any

misunderstanding, stating only: "Will get back to you next week once I am back in Beirut."

Aboutaam Decl. Ex. 1 at 7; 56.1 ¶ 26.

### C.      Mr. Aboutaam Provided Consideration

The June 18 Agreement was supported by consideration. First, Mr. El Assaad's proposal

included a $10,000 discount from the amount owed to Mr. Aboutaam under the terms of the

Sales Agreement. 56.1 ¶ 5; El Assaad Dep. 12:14-17. Second, the June 18 Agreement permitted

Mr. El Assaad to return the investment on a ten-month repayment schedule, instead of requiring immediate repayment. 56.1 ¶ 6; El Assaad Dep. 12:18-23.  Finally, the parties' agreement to settle their dispute out of court gave Mr. El Assaad the opportunity to avoid costly litigation. 56.1 ¶ 7; El Assaad Dep. 12:10-13; *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) (avoidance or dismissal of litigation is consideration for settlement agreement, which creates a separate contract); *see also Della Rocco v. City of Schenectady*, 278 A.D.2d 628, 630 (3d Dep't 2000) (holding that "forbearance of litigation" is valid consideration for a contract). Any one of these was enough to supply the necessary consideration.

The enforceability inquiry ends there: "Under long-standing New York common law, if an offer is made by one party, complete and definite in all material terms, the other party can create a contract by acceptance of that offer." *O-AT-KA Milk Prods. Co-op, Inc. v. TIC Gums, Inc.*, No. 13 Civ. 6347, 2014 WL 7215188, at *4 (W.D.N.Y. Dec. 17, 2014).

In addition, neither the brevity of the agreement nor the fact that it was created using a digital communication platform is an impediment to enforcement. *See Point Devs., Inc. v. Fed. Deposit Ins. Corp.*, 921 F. Supp. 1014, 1022 (E.D.N.Y. 1996) (denying defendant's motion for summary judgment based on the brevity of a one-sentence contract that provided a loan of "'$300,000 @ prevailing rate plus 1 additional point'"); *O-AT-KA Milk Prod.*, 2014 WL 7215188, at *5 (contract formation was complete upon receipt of email acceptance); *Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 254-55 (1st Dep't 2008) (holding that an email exchange in which defendant made an offer and plaintiff accepted created contract).

### D.    Mr. El Assaad Breached the Settlement Agreement

Despite his commitment to "honour what I said," Mr. El Assaad refused to make the payments he promised. He breached the June 18 Agreement when he failed to pay Mr.

Aboutaam $400,000 in December 2018, Aboutaam Decl. ¶ 5; 56.1 ¶ 8, and April 2019, Aboutaam Decl. ¶ 6; 56.1 ¶ 9, causing damages to Mr. Aboutaam of $800,000. *See Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556 (S.D.N.Y. 2004), *aff'd*, 418 F.3d 187 (2d Cir. 2005).

Because there can be no dispute regarding the formation of the settlement and its breach, summary judgment should be granted.

## II.   THIS COURT HAS JURISDICTION OVER THE AMENDED COMPLAINT

Mr. El Aboutaam's claims are appropriately brought here. The only argument Mr. El Assaad advances to dismiss Mr. Aboutaam's settlement claims is jurisdictional, and that argument fails. The agreement at issue here—the June 18 Agreement—is a separate, new agreement that has no choice of venue and does not incorporate any prior contracts. Mr. El Assaad's challenge to the Court's personal jurisdiction, which he raises only with regard to the third cause of action, must also fail. The court has personal jurisdiction because the harm from Mr. El Assaad's fraud was felt here in New York, where Mr. Aboutaam disbursed funds based on Mr. El Assaad's misrepresentations.

### A.   The Settlement Agreement is a Separate and Enforceable Contract

Mr. El Assaad's challenge to the Court's jurisdiction is based on a factual misstatement about the wrong agreement. Inexplicably, Mr. El Assaad declares "the [Sales Agreement] was signed by both [Mr. Aboutaam] and myself . . .  in Lebanon." El Assaad Decl. ¶ 3. The contract claim is about the June 18 Agreement—not the Sales Agreement. And Mr. Aboutaam signed the Sales Agreement in New York, not Lebanon. For the avoidance of doubt, Mr. Aboutaam has submitted an email exchange from Mr. El Assaad's assistant that explains the contract was sent by courier to Mr. Aboutaam in New York for his signature. "I already sent you 2 copies [of the

Sales Agreement] signed by Ahmad by DHL with AWB number 3196205246 to your address in New York," the assistant wrote: "please sign on one of them and send it back to me by FedEx or DHL." Aboutaam Decl. ¶¶ 9-10; *id.* Exs. 2, 3. Mr. El Assaad's unfounded but sworn statement that Mr. Aboutaam signed the contract in Lebanon is bewildering and it casts profound doubt on his credibility.

Regardless of Mr. El Assaad's misstatements about the location of the signatures of the Sales Agreement, however, his argument fails at the threshold: the Sales Agreement has no bearing on the Court's jurisdiction to enforce the June 18 Agreement. Courts in New York are clear: an agreement to settle a claim for breach of an underlying contract is "a new and separate enforcible [sic] agreement." *Woodrock Contracting Co. v. Young*, 283 A.D. 307, 307 (1st Dep't 1954); *cf. Scott v. JPMorgan Chase & Co.*, No. 13 Civ. 646, 2014 WL 338753, at *9 (S.D.N.Y. Jan. 30, 2014) ("Settlement agreements are contracts and must therefore be construed according to the general principles of contract law.") (internal quotation marks and citation omitted). That is what happened here.

After breaching his repayment obligation under the Sales Agreement, Mr. El Assaad negotiated a resolution "to solve the matter in a civil manner." 56.1 ¶ 13. Mr. El Assaad bargained down his total repayment obligation by $10,000 and negotiated a ten-month repayment schedule in exchange for avoiding litigation. *Cf. Kokkonen*, 511 U.S. at 381 (noting that avoidance or dismissal of litigation is consideration for settlement agreement, which creates a separate contract).

Mr. Aboutaam seeks declaratory relief and damages for breach of the *June 18 Agreement*, not of the Sales Agreement. *See* Am. Compl. ¶¶ 78-90. Mr. El Assaad relies on the irrelevant forum selection clause in the Sales Agreement. Def. Br. at 15-16. But "the facts to be determined

11

with regard to such alleged breaches of [a settlement agreement] are quite separate from the facts to be determined in the principal [contract] . . . ." *Kokkonen*, 511 U.S. at 381. That the Sales Agreement and the subsequent June 18 Agreement are related is insufficient to render them the same contract; "a common background or origin is not a sufficient basis, without more, for the Court to consider claims part of a common nucleus of operative fact." *Roman Y Gordillo, S.C. v. Bank of N.Y. Mellon Corp.*, No. 12 Civ. 212, 2014 WL 3507300, at *8 (S.D.N.Y. July 14, 2014).

**B.      The Settlement Agreement Did Not Incorporate the Sales Agreement**

To the extent Mr. El Assaad's briefing can be generously construed to suggest that the June 18 Agreement somehow incorporated the forum selection clause of the Sales Agreement, this argument also fails. New York courts conduct a searching inquiry before finding an underlying contract incorporated by reference: the new contract must identify or describe the prior contract "such that it is identifiable beyond all reasonable doubt." *Maines Paper & Good Serv., Inc. v. Keystone Assocs.*, 134 A.D.3d 1340, 1342 (3d Dep't 2015) (internal quotation marks omitted). This test is even more exacting when a defendant attempts to incorporate a forum selection clause to deprive a court of jurisdiction: such incorporation must be express. *See U.S. Steel Corp. v. Turner Constr. Co.*, 560 F. Supp. 871, 873-74 (S.D.N.Y. 1983) (general incorporation clause in derivative contract insufficient to incorporate forum selection clause); *Adams v. Boston Properties Ltd. P'ship*, 41 A.D.3d 112, 112 (1st Dep't 2007) (same).

Here, neither the June 18 Agreement nor any of the text messages preceding or following it has any reference to the Sales Agreement or its forum selection clause, let alone an express incorporation. The June 18 Agreement, therefore, cannot be read to contain any forum selection clause; "[i]f the terms of a contract are unambiguous, the obligations it imposes are to be

determined without reference to extrinsic evidence." *Town of Wallkill v. Tesa Tape Inc.*, 982 F. Supp. 300, 301 (S.D.N.Y. 1997) (internal quotation marks and citation omitted).

None of these facts is disputed. The Court should grant summary judgment on Plaintiff's fourth and fifth causes of action: the June 18 Agreement is enforceable; Defendants breached.

### C.      This Court Has Personal Jurisdiction over Mr. El Assaad For All Claims

Mr. Aboutaam has alleged sufficient facts to establish this Court's personal jurisdiction over Mr. El Assaad. Mr. Aboutaam's injury from the Pride fraud—the money he was induced to spend—was to lease an office space on East 66th Street. Am. Compl. ¶ 46. This harm— experienced in New York—grounds jurisdiction here. *Id.* ¶¶ 46, 77.

This Court may exercise jurisdiction over a person who "commits a tortious act without the state causing injury to person or property within the state . . . ." CPLR 302(3). The relevant inquiry for this case is where Mr. Aboutaam's injuries occurred.[2] "The situs of the injury is the location of the original event which caused the injury[.]" *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990)). For fraud claims, the situs of the injury—the event which causes the plaintiff harm—is the site where the plaintiff actually disburses funds as a result of the fraud. *See, e.g.*, *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 792 (2d Cir. 1999) ("Although the alleged omissions in this case occurred in Puerto Rico, New York was the place where [plaintiff] first disbursed its funds . . . ."); *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 900 (2d Cir. 1980)

---

[2]      New York also requires that a defendant "(i) regularly do[] or solicit[] business, or engage[] in any other persistent course of conduct, or derive[] substantial revenue from goods used or consumed arising from the act, or (ii) expect[] or should reasonably expect the act to have consequences in the state and derive[] substantial revenue from interstate or international commerce." CPLR 302(3)(i)-(ii). Mr. El Assaad has not challenged that he satisfies one, if not both, of these criteria. Because he has not challenged these grounds for personal jurisdiction in his moving papers, any such objections are waived. *Jack v. Strang*, No. 13 Civ. 5713, 2014 WL 4652596, at *2 (S.D.N.Y. Sept. 18, 2014).

(finding personal jurisdiction for fraud claim under New York law because "[o]ne immediate and direct 'injury' [defendant's] alleged tortious misrepresentations caused to plaintiffs was the loss of the money paid by them for the diseased vines"); *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 357 (E.D.N.Y. 2016) (London statements caused injury in New York, where Plaintiff wired money).

Mr. Aboutaam's New York injuries meet this test.

## III.   THE MOTION TO DISMISS THE AMENDED COMPLAINT FAILS

Mr. El Assaad's motion to dismiss relies on an alternate universe. It ignores allegations supporting Plaintiff's claims and injects irrelevant extra-record submissions. But a defendant cannot contest allegations to dismiss them.

To the contrary, on a motion to dismiss, a court must accept as true the complaint's well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). A defendant moving to dismiss must establish a complaint does not plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009); Fed. R. Civ. P. 12(b)(6). "To be plausible, the complaint need not show a probability of plaintiff's success," but need only "evidence more than a mere possibility of a right to relief." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013). Mr. El Assaad fails this standard.

When taken as true, the fraud claims are adequately alleged. In New York, Mr. Aboutaam's claims of fraud need only plead: (1) a misrepresentation or a material omission of fact that Mr. El Assaad knew to be false; (2) that Mr. El Assaad made the misrepresentation for the purpose of inducing Mr. Aboutaam to invest in his projects; (3) Mr. Aboutaam's reliance on

Mr. El Assaad's misrepresentations; and (4) a resulting injury. *Fung-Schwartz v. Cerner Corp.*, No. 17 Civ. 233, 2019 WL 4393022, at *3 (S.D.N.Y. Sept. 13, 2019).

While these claims must be pled with "particularity" under Fed. R. Civ. P. 9(b), that Rule "does not call for [Mr. Aboutaam] to plead every conceivable fact about the claims [he] allege[s] were fraudulent, or to prove [his] claims at the pleading stage." *United States ex rel. Forcier v. Computer Sci. Corp.*, 183 F. Supp. 3d 510, 521 (S.D.N.Y. 2016). Rather, he need only plead his claims with sufficient specificity to "provide [Mr. El Assaad] with fair notice of [his] claim and adequate information to frame a response." *Id.* As such, Mr. Aboutaam's claims must be allowed to proceed to discovery as long as his pleadings identify the "substance" of Mr. El Assaad's fraudulent statements. *Polycast Tech, Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 951 (S.D.N.Y. 1989) ("Rule 9(b) does not require a plaintiff to plead exact quotations.").

Each of Mr. Aboutaam's three fraud claims—regarding the charity, the land deals, and the apartment—specifies the dates, approximate times, and locations of Mr. El Assaad's fraudulent misrepresentations, and explains exactly how each misrepresentation was false. Moreover, "[w]here, as here, the particulars of fraud claims are peculiarly within the knowledge of the defendants, courts have relaxed the particularity standards of Rule 9(b)." *Starmark, Inc. v. Zaccaria*, No. 91 Civ. 2764 (JFK), 1992 WL 209288, at *2 (S.D.N.Y. Aug. 17, 1992).

### A.     The Amended Complaint Sufficiently Pleads Fraud Regarding SNG

The Amended Complaint pleads, with sufficient particularity, the date, time, location, and substance of Mr. El Assaad's false statements with respect to his efforts to secure Mr. Aboutaam's investment in SNG. It identifies—down to the hour—no fewer than *seven* specific instances of fraudulent misrepresentation. *See* Am. Compl. ¶¶ 17, 19. And the Amended Complaint also repeatedly pleads the substance of those misrepresentations: that Mr. El Assaad

"d[idn't] need [SNG] for [his] [political] party," *id.* ¶ 16; that "[t]here is nothing political about SNG," *id.*; that SNG "should not be connected to any politics," *id.* ¶ 19; and that "the money that was given to SNG would be used to support that organization's stated mission [of aiding impoverished children in Lebanon]," *id.* ¶ 16. All of those representations were false; the Amended Complaint alleges Mr. El Assaad began to "funnel funds intended to support [SNG] to underwrite [his own] failing political efforts." *Id.* ¶ 52. SNG's camps were "filled with his political party's logos and flags," and "the staffers were from his political party." *Id.* Mr. El Assaad betrayed his true intention after losing in a 2018 election, expressing consternation "that some of the [SNG students] that [he] ha[d] been sponsoring for years, had the audacity to help [his] opponents in this [sic] elections[.]" *Id.* ¶ 53. Mr. Aboutaam was not alone in realizing that SNG served as a front: investigative reporters later "examined the use of SNG funds and concluded that they had been used to support other real estate projects." *Id.* ¶ 54.

Mr. El Assaad does not dispute any of these allegations. Instead, he tries to dismiss the Amended Complaint because it does not allege "that anyone's contributions were misused, much less that *plaintiff's contributions* were misused." Def. Br. at 9 (emphasis in original). But the Amended Complaint alleges precisely that: Mr. El Assaad "funnel[ed] funds intended to support [SNG]" into his political campaigns and used SNG funds to support his real estate ventures. Am. Compl. ¶¶ 52, 54. That Mr. Aboutaam cannot track every dollar contributed to SNG to its specific misuse is immaterial; he need only allege Mr. El Assaad's failure to use SNG's funds for the promised purpose. *See Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 296 (S.D.N.Y. 2011) (finding triable issues of fact regarding defendant's "alleged failure to use the invested funds for their stated purpose," even without allegations of specific misuse). He need not specify the ways in which those funds were misused—a fact known only to Mr. El Assaad himself.

*Saunders v. Morton*, No. 5:09 Civ. 125, 2011 WL 1135132, at *8 (D. Vt. Feb. 7, 2011), *report and recommendation adopted*, 2011 WL 1114416 (D. Vt. Mar. 24, 2011) (allegations that "the money was never invested as promised" sufficient to establish falsity).

      **B.**    **The Amended Complaint Pleads Fraud Regarding Pride of Cote d'Azur**

      The Complaint also adequate alleges Mr. El Assaad made fraudulent misrepresentation of facts about Pride of Cote d'Azur. For example, in the middle of 2016, Mr. El Assaad "claimed to be developing [villas and apartments] in the south of France, in Mougins, Cannes and Theoule Sur Mer[.]" Am. Compl. ¶ 30. On August 10, 2016 and August 11, 2016, Mr. El Assaad and Mr. Aboutaam met in the InterContinental Hotel in Toronto, where Mr. El Assaad stated that "he had already purchased two pieces of property in the south of France and would be buying more." *Id.* ¶ 36. According to Mr. El Assaad, "he was already getting the building licenses and his architects were finalizing the plans." *Id.* In October 2016, Mr. Aboutaam traveled to France at Mr. El Assaad's invitation; there, Mr. El Assaad shared what he claimed to be "architects' drawings for the project," and he took Mr. Aboutaam to visit lands that Mr. El Assaad "claimed to have purchased." *Id.* ¶ 38. Based on the promise of active and ongoing development, Mr. El Assaad asked Mr. Aboutaam to invest in Pride of Cote d'Azur Realty LLC, promising to split expenses and profits. *Id.* ¶¶ 34, 41. Mr. Aboutaam agreed, relying on Mr. El Assaad's representations about owning land in France and sharing profits and expenses associated with Pride of Cote d'Azure Realty LLC. *Id.* ¶ 43.

      But the Amended Complaint alleges Mr. El Assaad "did not own the property he claimed to own in France," *id.* ¶ 41; he "had no property to sell in France" at all. *Id.* ¶ 40. The "architects' drawings" he showed Mr. Aboutaam "were either fabricated or plagiarized from the website of architect Jose Tauzia." *Id.* ¶ 38. And Mr. El Assaad "never intended to share the expenses of [the

business] with Mr. Aboutaam." *Id.* ¶ 44. Mr. Aboutaam was left saddled with Mr. El Assaad's

share of the company's rental fees—$145,360—all by himself. *Id.* ¶ 46.

Mr. El Assaad tries two arguments to justify his conduct; neither has merit.

### 1.    More Than a Bare Failure to Honor a Contract

First. Mr. El Assaad mischaracterizes—and ignores—the Amended Complaint,

describing Mr. Aboutaam's claim as only that "defendant did not intend to carry out a

promise[.]" Def. Br. at 11. Rather, Mr. Aboutaam has alleged that Mr. El Assaad lied about

owning the property in France, about having already retained an architect to provide drawings

and renderings, and about his plans for the real estate company. Am. Compl. ¶¶ 34-41. These

allegations are enough. *See, e.g.*, *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 302-03

(S.D.N.Y. 2011) (misrepresentations about ownership of IP that induced investment could

support claim for fraud); *M&T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 411-12 (E.D.N.Y.

2004) (finding fraud claim adequately pled where defendants made misrepresentations about

"the value and condition of the property" allegedly owned).

*Dornberger v. Metro. Life Ins. Co.*, the only case upon which Mr. El Assaad relies, is not

to the contrary. Although *Dornberger* noted that a conclusory assertion that a defendant never

intended to honor a promise would be insufficient to support a fraud claim, it nonetheless

concluded that a claim could move forward where, in addition to the assertion, a plaintiff pleads

facts "support[ing] an inference that [defendant] never intended to carry out its alleged promise .

. . ." 961 F. Supp. 506, 542 (S.D.N.Y. 1997). Indeed, *Dornberger* allowed a fraud claim to

proceed when the *only* alleged misrepresentation was about a defendant's intent to honor a

promise. Here, Mr. Aboutaam alleges much more. But even without these additional allegations,

Mr. Aboutaam satisfies the *Dornberger* requirement of pleading facts supporting the inference

that Mr. El Assaad never intended to honor his obligations: Mr. Aboutaam alleges that Mr. El

Assaad *staged a trip to France* and misrepresented his financial success to convince Mr.

Aboutaam that he would honor the agreement to split expenses. Am. Compl. ¶¶ 38-41.

### 2.      Justifiable Reliance

Mr. El Assaad's attack on Mr. Aboutaam's reliance comes to nothing. "Whether or not a

party's reliance on a representation as justifiable is typically a question of fact . . . ." *Idearc*

*Media LLC v. Siegel, Kelleher & Kahn LLP*, No. 09 Civ. 1090S, 2012 WL 162563, at *5

(W.D.N.Y. Jan. 18, 2012). Here, Mr. El Assaad told Mr. Aboutaam that he had already

purchased property for development in France. Am. Compl. ¶ 36. He told Mr. Aboutaam that "he

was already getting the building licenses . . . ." *Id.* And he showed Mr. Aboutaam fabricated or

plagiarized architectural drawings of the proposed construction. *Id.* ¶ 38. These lies collectively

gave the impression that development sites had been selected, administrative hurdles had been

cleared, and plans for the buildings had been finalized. From Mr. Aboutaam's perspective,

therefore, construction was ready to begin—as he repeatedly pushed for after entering into the

venture. *Id.* ¶ 47. He relied on this false picture of the French development in agreeing to invest.

*Id.* ¶ 43. And such reliance was reasonable.

Contrary to Mr. El Assaad's argument, Def. Br. at 12, Mr. Aboutaam's lack of familiarity

with the industry only *strengthens* the inference that he reasonably relied on Mr. El Assaad—

who presented himself as a more seasoned veteran of the industry. For example, in *Ogunsaya v.*

*Langmuir*, this Court rejected this same argument when denying a motion to dismiss a fraud

claim because an unsophisticated party was entitled to rely on more sophisticated parties'

representations. No. 08 Civ. 940, 2008 WL 4426590, at *4 (E.D.N.Y. Sept. 26, 2008).

19

At heart, Mr. El Assaad attempts to characterize his malfeasance as mere optimism about the prospects of his company. But his deliberate and conscious misrepresentations foreclose any such claim: "[P]ollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018).

### C.    The Amended Complaint Pleads Fraud Relating to the Magnolia

Finally, Mr. Aboutaam has alleged a third fraud claim regarding the Magnolia. The Amended Complaint alleges Mr. El Assaad made misrepresentations about the location and scenery of the development: he promised "unobstructed, sunset views from the property," complete with falsified pictures of the supposed view, Am. Compl. ¶¶ 24, 26, 57, and surroundings of a "secluded and quiet mountain area," *id.* ¶ 26. Mr. El Assaad also promised that "no one [else] would be able to buy land and build there." *Id.* ¶ 58. Each claim was false.

Mr. El Assaad does not dispute that these allegations state a claim for fraud. Rather, he claims that one line in the Sales Agreement—that it was signed "after having reviewed all maps, design, technical and engineering specifications"—forecloses relief, because Mr. Aboutaam could not have reasonably relied on Mr. El Assaad's fabricated photos and misrepresentations. Alternatively, he argues that Mr. Aboutaam ratified the fraud after discovering it. But Mr. Aboutaam's reliance on Mr. El Assaad was reasonable, and ratification is not a defense to fraud.

### 1.    Reasonable Reliance

"Whether or not reliance on alleged misrepresentations is reasonable in the context or a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311, at *10 (S.D.N.Y. Aug. 3, 1999). A court may determine, however, that a party's reliance was

unreasonable as a matter of law if the party expressly disclaims reliance on the other's representations, or if "the relevant facts were easily accessible to the relying party." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997). For a contractual term to defeat claims of fraud, it must "*specifically* disclaim[] reliance upon a representation" made by the other party. *Kidd v. Spector*, No. 93 Civ. 7297, 1998 WL 879698, at *3 (S.D.N.Y. Dec. 15, 1998) (emphasis added). Courts are disinclined to apply these rules at the pre-answer stage in cases involving affirmative misrepresentations, rather than nondisclosure. *Id.* Neither rule bars Mr. Aboutaam's recovery.

Here, the Sales Agreement contains no disclaimer of reliance. Mr. El Assaad nonetheless makes much of one "whereas" clause which states that the agreement was entered into "after having reviewed all maps, design, technical, and engineering specifications . . . ." El Assaad Decl. Ex. 1. But a "general and vague merger clause"—even one that generally disclaims reliance—is insufficient to defeat a claim of fraud. *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315-17 (2d Cir. 1993) (summarizing New York law); *accord Blue Ridge Farms, Inc. v. Crown Equip. Corp.*, No. 01 Civ. 8460, 2005 WL 755756, at *12 (E.D.N.Y. Mar. 28, 2005) (distinguishing "general and vague merger clause" from clause that "specifically declares that the parties to the agreement do not rely on specific representations not embodied in the contract" (internal quotation marks and citation omitted)). The Sales Agreement does not meet this exacting test; it contains no merger clause or waiver at all, let alone one that is sufficiently specific to warrant dismissal.

Further, in claiming that the only fraudulent statements relate to the location of the Magnolia development, Mr. El Assaad misconstrues the scope of Mr. Aboutaam's allegations. *See, e.g.*, Def. Br. at 13. The Amended Complaint alleges Mr. El Assaad lied about the location

21

of the development. *See, e.g.*, Am. Compl. ¶ 26. But it also alleges that Mr. El Assaad lied about surrounding development rights, views from the property, and noise levels, *see id.* ¶¶ 24, 26, 57—none of which would be reflected on a map alone. That Mr. Aboutaam signed onto a contract showing that he knew the general geographic location of the townhouse is no evidence that he knew what the views from the property were, what the surrounding traffic patterns were like, or which other developers had been able to purchase and build new apartment buildings in the area. These factual questions preclude dismissal of Mr. Aboutaam's claims.

Nor can Mr. El Assaad establish, as a matter of law, that the truth about the Yarzeh property was so easily accessible to Mr. Aboutaam as to warrant dismissal. "Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts." *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) (internal quotation marks and citation omitted). Where questions exist over how easily a plaintiff could access the subject property, or whether inspection of the property would have revealed the extent of the misrepresentation, dismissal is inappropriate. *Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.*, 880 F. Supp. 96, 98 (N.D.N.Y. 1995).

Measured by these standards, it is premature for Mr. El Assaad to suggest that Mr. Aboutaam "had the means available to him to know all of the facts concerning the location of the Townhouse." Def. Br. at 14. Before Mr. Aboutaam can be faulted for supposedly failing to *fly to Lebanon* to personally inspect the property, Mr. El Assaad must establish that Mr. Aboutaam was put on "constructive notice that a fraud has been perpetrated." *Standard Sec. Life Ins. Co. of N.Y. v. Berard*, 684 F. App'x 56, 59 (2d Cir. 2017). He cannot. Nowhere does he even suggest that anything about his elaborate scheme, as alleged in the Amended Complaint, was sufficient to place Mr. Aboutaam "on guard" that he would be defrauded. To the contrary, Mr. El Assaad

22

affirmatively hid the truth by showing Mr. Aboutaam falsified images to misrepresent the views

from the building. Am. Compl. ¶ 57. Under such circumstances, Mr. El Assaad cannot escape

liability by arguing that Mr. Aboutaam should have known of the fraud. *Cf. Babaev v. Grossman*,

No. 03 CV 5076, 2007 WL 633990, at *6 (E.D.N.Y. Feb. 26, 2007) (considering the defendant's

"concealment of the fraud" in denying motion for summary judgment). Mr. El Assaad

deceptively misrepresented key facts to induce Mr. Aboutaam to invest in a failing venture. He

cannot avoid liability by claiming that Mr. Aboutaam should not have believed him.

## 2.    Ratification Is Not a Defense to Fraud

Mischaracterizing the relief sought—and citing only one 1890 case—Mr. El Assaad

argues "affirmance of a contract forecloses rescission of that agreement on the grounds of fraud."

Def. Br. at 14). Once again, Mr. El Assaad's own authority precludes his own argument. Mr.

Aboutaam does not seek to rescind the Sales Agreement. He seeks *damages* flowing from the

fraud. The availability of rescission is irrelevant; "[t]he doctrine that any act in affirmance of a

contract, after discovery of fraud, defeats the right of rescission *is not necessarily applicable to

an action for damages founded on the fraud*." *N.Y. Land Improvement Co. v. Chapman*, 118

N.Y. 288, 289 (1890) (emphasis added). Even if he had ratified the contract, Mr. Aboutaam

"would be entitled to damages arising from fraud if he could prove that such fraud in the

inducement occurred and that he was damaged thereby." *Petrello v. White*, 412 F. Supp. 2d 215,

227 (E.D.N.Y. 2006).

Defendants' ratification argument also fails because it relies on improper extra-record

evidence to claim that Mr. Aboutaam sought mortgage financing between December 2017 and

March 2018. *See, e.g.*, Dkt Nos. 44, 44-2. But Mr. El Assaad's declaration and emails cannot

support a motion to dismiss. A "court normally may not look beyond the four corners of the

complaint in considering a motion to dismiss." *Mayo v. Fed. Gov't*, 558 F. App'x 55, 56 (2d Cir.

2014). A Rule 12(b)(6) motion "is not an occasion for the court to make findings of fact." *Roth v.*

*Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Radiancy, Inc. v. Viatek Consumer Prods. Grp.,*

*Inc.*, 138 F. Supp. 3d 303, 316 (S.D.N.Y. 2014).[3]

## CONCLUSION

Summary judgment should be granted; the motion to dismiss should be denied.

Dated:      New York, New York
            December 6, 2019

EMERY CELLI BRINCKERHOFF
& ABADY LLP

_____/s/_____

Richard D. Emery
O. Andrew F. Wilson
Andrew K. Jondahl

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs*

---

[3]      These extra-record documents were not incorporated by reference or integral to the Amended Complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).