**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

HICHAM ABOUTAAM,                              :

                                              :

                              Plaintiff,      :

        -against-                             :         **1:18-CV-8995 (ALC)**

                                              :         **OPINION AND ORDER**

AHMAD EL ASSAAD and PRIDE INVESTS             :
SAL,
                                              :

                              Defendants.     :

                                              :

-------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/31/20_____

**ANDREW L. CARTER, JR., United States District Judge:**

## BACKGROUND

Plaintiff Hicham Aboutaam brings this action alleging fraud, fraudulent inducement, and breach of contract against Ahmad El Assaad and his Company Pride Invests SAL. (Am. Compl. ECF No. 14). Defendants now move to dismiss Plaintiff's complaint in its entirety. (ECF No. 39). Plaintiff moves for partial summary judgment. (ECF No. 71).

Defendants' motion to dismiss is DENIED in part with prejudice and DENIED in part without prejudice. Plaintiff's motion for partial summary judgment is DENIED without prejudice.

### I. Facts

Plaintiff Aboutaam is the cofounder of an art gallery in Switzerland and the owner of a New York art gallery. He is a citizen of New York, New York. (Am. Compl. at ¶ 5). Defendant El Assaad is a real estate developer and the Founder and Chairman of a Lebanese political party

called the Lebanese Option Party ("LOP"). He is a citizen of Beirut, Lebanon. (*Id.* at ¶ 6). Private Invests SAL is business in Lebanon that conducts business in New York through its Chairman, El Assaad. (*Id.* at ¶ 7).

El Assaad helped to start a charity called Saving the Next Generation ("SNG"), which aids children in impoverished areas of Lebanon. (*Id.* at ¶ 14). El Assaad told Aboutaam about SNG's mission "to revitalize and encourage Lebanese youth to become world citizens and ambassadors for a modern, progressive Lebanon" on multiple occasions between 2012 and 2014. (*Id.* at ¶ 15). SNG's website also made claims about the Organization's progress. The site claimed SNG had enrolled "500 children to participate in 19 weekend camps and 60 day trips" and had met other, similar milestones through 2013. (*Id.*). After 2013, Plaintiff alleges that SNG did very little. (*Id.*).

El Assaad allegedly encouraged Aboutaam to donate money to SNG repeatedly. (*Id.* at ¶ 16). In a July 2012 conversation, Aboutaam expressed concerns about the impropriety of the Charity having a political affiliation. (*Id.* at ¶ 17a). El Assaad assured Aboutaam that "the contributions [would] not have any relationships to [his] politics." (*Id.*) In an October 2012 discussion, El Assaad again committed to maintaining separation between the Charity and politics. The two discussed revising SNG's promotional DVD to eliminate all political references on multiple occasions in 2014, 2015, and 2016. (*Id.* at ¶ 17b). In November 2014, "Mr. El Assaad met with Mr. Aboutaam to discuss a proposal by a potential SNG donor to include impoverished Palestinian children in refugee camps." (*Id.* at ¶ 17c). El Assaad had communicated that he only wanted to support Lebanese children, which Aboutaam said could be construed as reflecting SNG's political agenda. "El Assaad repeated his categorical denial of any relationship between his political party and SNG." (*Id.*) Aboutaam also alleges that El Assaad

stayed silent when other SNG employees made statements to him and other donors communicating SNG's independence from El Assaad's political group. (*Id.* at ¶ 19).

According to Aboutaam, El Assaad's statements were false and he knew they were false at the time he made them. Aboutaam asserts that El Assaad made these statements to induce him to donate funds, which El Assaad used to support his political ambitions. (*Id.* at ¶¶ 18, 52). Aboutaam relied on these false representations in choosing to support SNG financially and by organizing fund-raising events in New York City using his own local contacts. (*Id.* at ¶ 20). Aboutaam allegedly contributed $30,000 to SNG personally through direct donations and his donation of artwork for a fund-raising auction. (*Id.* at ¶ 21).

In around April 2015, El Assaad induced Aboutaam into another financial commitment. El Assad explained that his real estate business had a luxury apartment building called The Magnolia in Yarzeh, Lebanon with individual units called townhouses. (*Id.* at ¶¶ 24, 29). He told Aboutaam that he would personally have a townhouse apartment in the development and was offering several other Lebanese-American businessmen the opportunity to purchase pre-construction units. (*Id.* at ¶ 25). He emphasized, among other things, that the development had "unobstructed, sunset views" and was in a quiet neighborhood. (*Id.* at ¶¶ 24–25). El Assaad also told Aboutaam that he had exclusivity rights that would prevent anyone else from being able to buy and develop properties surrounding the Magnolia. (*Id.* at ¶ 58).

Aboutaam agreed to purchase a townhouse and he and El Assaad entered into a Sale Agreement on June 25, 2015, wherein Aboutaam committed to pay $810,000 for at apartment in the Magnolia. El Assaad conducted the transaction through Pride Invests. (*Id.* at ¶ 29). The Agreement provided that "El Assaad would 'immediately return to [Mr. Aboutaam] all sums

paid by him without any compensations or commissions if Mr. Aboutaam decided to revoke his investment." (*Id.*) (internal quotation marks omitted).

In the middle of 2016, El Assaad offered Aboutaam a business opportunity to "enter into a partnership to promote a new real estate market—selling villas and apartments that Mr. El Assaad claimed to be developing in the south of France, in Mougins, Cannes and Theoule SurMer, which were once heavily promoted on prideofcotedazur.com but no longer appear there." (*Id.* at ¶ 30). El Assaad called the business "Pride of Cote d'Azur Realty LLC" (*Id.* at ¶ 41), and told Aboutaam "he expected to sell $20 million in property the first year and that sales would grow from there." (*Id.* at ¶ 35). He also communicated "that he had already purchased two pieces of property in the south of France and would be buying more. He explained that he was already getting the building licenses and his architects were finalizing the plans." (*Id.* at ¶ 36). The "business plan called for potential home buyers to provide down payments on pre-construction properties in the south of France that were to be built on land that Mr. El Assaad claimed he already owned." (*Id.* at ¶ 45).

El Assaad also "invited Mr. Aboutaam to travel to the property and meet the architects," (*Id.*), and about two months later, in October 2016, Aboutaam travelled to France, where El Assaad showed him architectural drawings for the project and took him to visit the land El Assaad said he owned. (*Id.* at ¶ 38). The two also toured other potential properties with real estate brokers. Aboutaam stayed in a villa in Cannes that El Assaad asserted was his own, but that Aboutaam later learned was rented. (*Id.* at ¶ 39). He told Aboutaam that if they partnered, they would share all expenses and profits. (*Id.* at ¶ 41). According to Aboutaam, the whole venture and trip was a scam. El Assaad owned no property to sell in France. (*Id.* at ¶ 40–41).

4

Before Aboutaam realized the fraudulent nature of the business, he entered into a limited liability company agreement with El Assaad to create Pride of Cote d'Azur Realty, LLC, a Delaware company. (*Id.* at ¶ 44). The Agreement provided that each party owned a 50% interest in the company and that "profits and losses shall be allocated…according to their Percentage Interests." (*Id.*) After entering into their agreement, the parties entered into a lease for a Company office in New York. It was a 62-month lease costing an average of $6,320 a month. (*Id.* at ¶ 46). El Assaad's share of the five-year rental fees was $ 145,360." (*Id.*)

Aboutaam realized the business was fraudulent when, over time, the Company never built anything. Aboutaam insisted repeatedly that they start construction, but allegedly, El Assaad resisted and emphasized that the delay was industry standard. (*Id.* at ¶¶ 47–48). Aboutaam alleges that El Assaad never built any of the properties he promised to construct in France, and never purchased the land he previously advertised on the trip. (*Id.* at ¶ 49). The Company's website used to have "videos, renderings, measurements, and prices" for the French properties, but this information has since been deleted. (*Id.* at ¶ 49).

By the spring of 2018, Aboutaam had lost all patience with El Assaad. He had visited Lebanon in November 2017 and learned that El Assaad had sold no other apartment townhouses in the Magnolia complex, and many units remained unbuilt. He also learned that the apartment he purchased had views obstructed by a tower facing the development and the gigantic quarters of the Lebanese Military of Defense. (*Id.* at ¶ 57). Additionally, the apartment's location was not quiet. It sat "on a two-way street routinely filled with cars awaiting a major Lebanese army checkpoint." (*Id.*) Aboutaam realized that the pictures El Assaad had shown him were staged, "shot by a drone, according to one of [El Assaad's employees], and placed in the air above the building to show the sunset and the sea. But, contrary to these misleading images, the building is

almost entirely shaded from the sun." (*Id.* at ¶57). Aboutaam also saw other newly constructed

buildings around the Magnolia that undermined El Assaad's exclusivity assurances. (*Id.* at ¶ 58).

Because of these concerns, on May 21, 2018, Aboutaam terminated the Sale Agreement

for the Magnolia apartment by email. He also "demanded the return of his investment of

$810,000, and he provided Mr. El Assaad a grace period until May 31, 2018 to comply.' (*Id.* at ¶

59). Because El Assaad did not comply, Aboutaam retained counsel who wrote to El Assaad on

May 23, 2018 seeking recovery of the $810,000 investment. (*Id.* at ¶ 60).

On June 3, 2018 El Assaad sent Aboutaam a message through WhatsApp that read: "Will

pay you 400k in December of this year and another 400k in April of 2019." (*Id.* at ¶ 61; ECF No.

74-1 at 2; ECF No. 82 at ¶ 1). The parties exchanged additional texts, attempting to flush out the

terms of what Aboutaam classifies as a "settlement." (Am. Compl. at ¶ 61).

On June 15, 2018, Aboutaam sent El Assaad the following message over WhatsApp:

> Ahmad,
> I agree with you that it is better for us both if we avoid litigation and reach an
> amicable settlement.
> I accept your proposal that the refund is paid in December 2018, and April 2019,
> in 2 equal payments of $405k each ($810k total), and that two promissory notes
> are signed in this respect. I think we organize our agreement as follows:
> A) If by Dec 7, 2018 the first $405k is not received, then the title of the apartment
>    will automatically transfer to me in full. To your advantage, that will trigger
>    an option, that expires on April 15, 2019, for you to sell the property for over
>    1 million dollars. After I am paid the million, any amount above the $1
>    million will then be split 60% to me and 40% to you.
> B) If the December half is received, but by April 8, 2019, the second half is not,
>    then the title of the apartment will be transferred to me in full. To your
>    advantage that will trigger an option, that expires on June 15, 2019, for you to
>    sell the property for over 1 million dollars. After I am paid the million, any
>    amount above the $1 million will be split 75% to me and 25% to you.
> C) Another solution is that you transfer title to me now and you'll have an
>    immediate option that expires by the end of September 2018, to sell the
>    property for over $1 million. After I am paid the $1 million, any amount
>    above the $1 million will then be split 50%/50%. If you sold me the apartment
>    on blue prints for a discounted price of $2.9 million, I am pretty sure that, now

> that it's built and finished, you'll be able to sell it for significantly over $1 million.
>
> We should put the tittle of the apartment is escrow with your lawyer, so that it can be given to me if there is a late payment.

(ECF No. 74-1 at 4–6; ECF No. 82 at ¶ 2).

On June 16, 2018, El Assaad responded, stating: "What you are suggesting is simply ridiculous. I will honour what I said. If this is not enough for you, then I have nothing else to say." (ECF No. 74-1 at 6; ECF No. 82 at ¶ 3). After some back and forth, (ECF No. 74-1 at 7–8), Aboutaam sent El Assaad a WhatsApp message which stated, in relevant part: "I accept your proposal, with kateb el-adel, that you make two payments to me in December 2018, and April 2019, in equal amounts of $400K." (*Id.* at 8). El Assaad wrote: "Will get back to you next week once I am back in Beirut" in response. (*Id.*).

Aboutaam alleges that El Assaad sent him "a revised agreement containing new material terms that had never been discussed, including the right to demand an additional $120,000 if the apartment was not sold. These additional terms demonstrated a disregard for the previously-agreed settlement." (*Id.* at ¶ 63). El Assaad did not make either $400 payment to Aboutaam. (ECF No. 82 at ¶¶ 8–10).

## II. Procedural Posture

Aboutaam filed this action against El Assaad in New York state court. The case was removed to federal court in the Southern District on October 1, 2018. (ECF No. 1). On January 11, 2019, Aboutaam amended his complaint. (ECF No. 14). The amended complaint sets forth five causes of action. The first is for El Assaad's fraudulent conduct regarding SNG. Aboutaam alleges that El Assaad made misrepresentations to him about where his donations to SNG would go and that he knew his statements were false and malicious at the time he made them. (Am. Compl. at ¶ 65). Further, Aboutaam asserts that "El Assaad made these misrepresentations with

the intent to persuade Mr. Aboutaam and others to invest in SNG…[and] El Assaad caused the monies donated to the SNG charity to be spent elsewhere, including to support his own political ambitions." (*Id.*). Aboutaam alleges that he "was damaged by these false representations because he made donations to SNG reasonably relying on these misstatements…[thus] El Assaad is liable to Mr. Aboutaam for the value of all donations Mr. Aboutaam made to SNG in an amount to be determined at trial." (*Id.* at ¶¶ 66–67).

The second cause of action is for fraudulent inducement and is asserted against El Assaad and Pride Invests. Aboutaam alleges that El Assaad, to induce him to purchase real estate, made misrepresentations about "the nature of the location and view and the uniqueness of the Magnolia property development" that were false and malicious. (*Id.* at ¶ 69–70). Further, El Assaad knew these representations to be false at the time he made them. (*Id.* at ¶ 69). As relief, Aboutaam "seeks rescission of the June 25, 2015 Sale Agreement and disgorgement of all monies paid to Mr. El Assaad and Pride Invests SAL relating to the Magnolia investment, together with prejudgment and post judgment interest in an amount not less than $810,000, to be determined at trial." (*Id.* at ¶ 72).

Third, Aboutaam claims that El Assaad committed fraud with respect to the Pride of Cote d'Azur real estate project. He alleges that" El Assaad's representations that he would develop real estate in the south of France were false and malicious…[as] he never had any intention to develop real estate in France and, contrary to his representations, he never owned the three plots of land to develop the [promised] real estate either." (*Id.* at 74). Aboutaam claims that he made payments to support Pride of Cote d'Azur based on the false statements El Assaad made knowingly to induce Aboutaam to invest. (*Id.* at ¶¶ 75–76). "Accordingly, Aboutaam seeks reimbursement of all monies paid in support of Pride of Cote d'Azur and reimbursement for all

current expenses of the business, including rent for the remainder of the lease, in an amount to be determined at trial." (*Id.* at ¶ 77).

Aboutaam's fourth and fifth causes of action concern the Magnolia property. Aboutaam asserts that he and El Assaad reached a binding settlement agreement on June 18, 2018 through their WhatsApp conversation. (*Id.* at ¶ 85). Aboutaam alleges that El Assaad attempted to repudiate that agreement by sending a draft settlement with additional and extraneous terms. (*Id.* at ¶ 80). Because he "has no adequate remedy at law to ensure compliance with the June 18 Settlement…Aboutaam seeks a declaration…that the June 18 Settlement is enforceable" (fourth cause of action). (*Id.* at ¶¶ 81–82).

Aboutaam also alleges breach of the June 18 agreement (fifth cause of action) (*Id.* at ¶¶ 84–90). He alleges that he "has been damaged by" El Assaad's refusal to pay him "under the terms of the June 18 Agreement[.]" (*Id.* at ¶¶ 89–90).

On August 9, 2019, El Assaad and Pride Invests moved to dismiss the Amended Complaint in its entirety. (ECF No. 40, 41). Defendants raise four arguments in support of dismissal. First, Defendants argue that the first and third causes of action must be dismissed pursuant to 12(b)(6) because the fraud claims lack the particularity required by Fed. R. Civ. P. 9(b) and fail to allege the essential elements of fraud. (ECF No. 41 at 7–13).

Second, Defendants argue the second cause of action similarly warrants dismissal pursuant to 12(b)(6) because this fraud claim is barred by the text of the Parties' Sale Agreement and Plaintiff's access to the relevant information about the Magnolia complex's views, neighborhood, etc. before signing the contract (*Id.* at 13).

Third, Defendants argue that the court lacks personal jurisdiction over El Assaad with respect to the third cause of action and thus, it must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2). (*Id.* at 18–19).

Fourth, Defendants assert that the fourth and fifth causes of action should be dismissed under Fed. R. Civ. P. 12(b)(1) because this court does not have subject matter jurisdiction over these claims. Specifically, Defendants argue that the disputes raised by these claims are under the exclusive jurisdiction of courts in Beirut, Lebanon. (*Id.* at 16).

In response to Defendants' motion, Plaintiff filed a cross-motion for partial summary judgment. (ECF No. 71). Plaintiff argues that partial summary judgment is appropriate on Plaintiff's fifth cause of action for breach of the June 18 settlement agreement made through WhatsApp communications.

## DISCUSSION

### I. Legal Standards

### A. 12(b)(1) Motion to Dismiss

"The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc*., 426 F.3d 635, 638 (2d Cir. 2005). However, "[i]n resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

### B. 12(b)(2) Motion to Dismiss

The "plaintiff bears the burden of showing that the court has [personal] jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 2066 (S.D.N.Y. 2003). "To

meet this burden" and thereby defeat a motion to dismiss, "plaintiff must plead facts sufficient for a prima facie showing of jurisdiction." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 510 (S.D.N.Y. 2016).

"In diversity…cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits." *Id.* at 512. Courts in New York must consider two questions: "(1) whether there is jurisdiction under New York law; and (2) whether the exercise of jurisdiction would be consistent with federal due process requirements." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 806 (S.D.N.Y. 2017). Jurisdiction under New York law can be pursuant to the State's general jurisdiction statute, N.Y.C.P.L.R. § 301, or its long-arm statute, N.Y.C.P.L.R. § 302(a).

For the due process analysis, courts must determine (1) "whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant" (the "minimum contacts" inquiry), and (2) "whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' " (the "reasonableness" inquiry). *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (internal quotations marks omitted); *see Comunale v. Gemma*, No. 18-cv-12104, 2020 WL 635554, at *3 (S.D.N.Y. Feb. 11, 2020)).

**C. 12(b)(6) Motion to Dismiss**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that

allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 986 (S.D.N.Y. 2017) (quoting *Id.* (citing *Twombly*, 550 U.S. at 556).

"In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor." *K.A. v. City of New York*, 413 F. Supp. 3d 282, 294 (S.D.N.Y. 2019). "However, the court need not credit '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Lewis*, 246 F. Supp. 2d at 986 (quoting *Iqbal*, 556 U.S. at 678) (alteration in original).

"On a motion to dismiss, a court may consider facts stated in the complaint, any document attached to the complaint, and any documents incorporated by reference into the complaint." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 318 (S.D.N.Y. 2012) (internal citations omitted).

**D. Summary Judgment**

"Under Fed. R. Civ. P. 56, summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law." *Gutierrez v. City of New York*, No. 15-cv-9907, 2019 WL 1427391, at *2 (March 29, 2019). "There is no issue of material fact where the facts are irrelevant to the disposition of the matter." *Campbell v. Hanson*, 17-cv-1024, 2019 WL 2717691, at *3 (S.D.N.Y. June 28, 2019).

"In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gutierrez*, 2019 WL 1427391, at *2. Courts "may not make credibility determinations or weigh the evidence ... 'Credibility determinations ... [is a] jury function[ ], not [that] of a

judge.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255).

## I. First and Third Fraud Claims 9(b)

"To state a claim for common law fraud in New York, a plaintiff must plead that '(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss[.]'" *Cummings v. City of New York*, No. 19-cv-7723, 2020 WL 882335, at *13 (S.D.N.Y. Feb. 24, 2020) (quoting *Stephenson v. PricewaterhouseCoopers, Ltd. Liab. P'ship*, 482 F. App'x 618, 622 (2d Cir. 2012) (citation omitted)).

But a plaintiff alleging common law fraud also must meet the heightened particularity pleading standard of Fed. R. Civ. P. 9(b). Rule 9(b) "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015).

Defendants argue that Plaintiff's first and third causes of action fail to allege facts that, if true, establish the required elements of a New York fraud claim. Further, Defendants contend that these claims fail to meet the heightened pleading standard demanded by Rule 9(b).

### A. Fraud Involving SNG

Plaintiff's Amended Complaint alleges that El Assaad stated that "[t]here is nothing political about SNG"; that "the contributions [to SNG] will not have any relationships to [his] politics";

and that he needed "more funds because we [SNG] are expanding and sending kids to universities." (Am. Compl. at ¶¶ 16, 17a). He also provided the times and locations of these statements. Defendants, however, argue that Aboutaam failed to plead facts showing that these statements were false. Specifically, Defendants assert that Aboutaam does not allege a single particularized fact that anyone's contributions to SNG were misused, much less that his contributions specifically were misused. (ECF No. 41 at 14).

Aboutaam alleged that he learned about the fraud within SNG through a variety of sources. He stated that an "SNG board member had expressed concerns about the political connections of the organization. And one of SNG's former presidents who had raised similar concerns resigned from the organization after hearing reports from SNG's public relations representative who had visited SNG's camps in Lebanon." (Am. Compl. at ¶ 51). Aboutaam did provide any further identifying information about these sources, and did not specify whether he heard of these incidents from the sources first-hand or second-hand from others. Aboutaam also provided that

> Information arose that suggests Mr. El Assaad…abused his position of power with the charity to funnel funds intended to support Lebanese children to underwrite Mr. El Assaad's failing political efforts. The camp was filled with his political party's logos and flags, the staffers were from his political party, and his wife, who held a major position in SNG, also was Youth Chancellor at the Lebanese Option Party from 2010 and was herself a failed candidate to the Lebanese parliament in 2018. Based on multiple reports from people with personal knowledge of SNG's operations, the camp and donations intended to promote SNG were used to support the image of Mr. El Assaad's political organization. Some suspected that Mr. El Assaad had taken those funds to use them for his political activities while also promoting SNG as a platform to try to solicit the votes of the impoverished student participants and their families…Mr. Aboutaam [also] found an article on a website that examined the use of SNG funds and concluded that they had been used to support other real estate projects. The article concludes: "As for the political money to support the 'Saving The Next Generation' case story, a well-informed source tells that it went to the following gutters: Properties purchased…under the name: Pride Investment.

(*Id.* at ¶¶ 52, 54).

Defendants argue that all this alleged information about the political use of SNG charitable funds is attributed to anonymous sources, and thus, not particularized enough to satisfy Rule 9(b). (ECF No. 41 at 9–10).

Plaintiff provided specific reasons as to why he believes that El Assaad committed fraud by using donor contributions to SNG for purposes other than the Organization's mission. He said his knowledge came from "people with personal knowledge of SNG's operations" as well as from newspaper articles. At this stage of the litigation, he was not required to provide the Defendants with more, even under the particularity requirements of 9(b). He put Defendants on notice as to how he believes the money he donated was used, the general sources of that specific information, and why he believes that use was fraudulent (*i.e.* it directly contradicted the representations made to him directly by El Assaad). This is enough. *See Novak v. Kasaks*, 216 F.3d 300, 304, 312–313 (2d Cir. 2000) (Plaintiffs had alleged that Defendants committed securities fraud by making "materially false and misleading statements and omissions concerning the financial performance of Ann Taylor…primarily by failing properly to account for millions of dollars of inventory"; District court determined that Plaintiffs failed to meet particularity pleading requirement of 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1) "in substantial part because they failed to reveal their confidential sources," but Second Circuit reversed, noting that "there is nothing in the caselaw of this circuit that requires plaintiffs to reveal confidential sources at the pleading stage" and additionally, that its reading of "the PSLRA rejects any notion that confidential sources must be named as a general matter.").

Aboutaam pled the required elements of fraud under New York law and did so with particularity in accordance with 9(b). Thus, Defendants' motion to dismiss with respect to Count One is DENIED.

### B.  Fraud Involving French Real Estate

Defendants argue that the third cause of action should be dismissed because Aboutaam

failed to plead facts to support his assertion that El Assaad never intended to pursue the French

development, plead facts indicating which properties El Assaad deceptively represented he

owned in France, and plead facts to support his assertion that he justifiably relied on El Assaad's

representations in contributing funds to the LLC. (ECF No. 41 at 16–17).

### 1.  Fraudulent Intent

"[F]raudulent intent is not demonstrated by mere evidence of non-performance of a

promise." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 514 (S.D.N.Y.

2005) (quoting *Murray v. Xerox Corp.*, 811 F.2d 118, 122 (2d Cir. 1987). However, a promise

combined with facts establishing a strong inference of fraudulent intent is sufficient. *See Harrell*

*v. Primedia, Inc.*, No. 02 CV 2893, 2003 WL 21804840, at *2 (S.D.N.Y. Aug. 6, 2003). "The

requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that

defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v.*

*Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Aboutaam's allegations establish the requisite inference of recklessness. He alleges that

El Assaad lied to him about owning property in France to induce him to invest in the real estate

company. El Assaad's ownership of these properties was critical information that would have

affected an investor's perception of Pride of Cote d'Azur's likelihood of success. *See Sawabeh*

*Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 304 (S.D.N.Y. 2011) (misrepresentations about

IP ownership made to induce investment established reckless for purposes of the scienter

requirement of a fraud claim); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F.

16

Supp. 2d 385, 404 (S.D.N.Y. 2005) (defendants alleged to have overstated net asset values ("NAVs") of hedge funds and misrepresented that the NAVS would be calculated using independent pricing; court found complaint's allegations gave rise to a strong inference of recklessness on behalf of Fud's CFO because he allegedly "had access to the pricing sheets reflecting [the Fund's] internal valuations, and supervised the calculation of NAV using these prices").

As for motive and opportunity, those are more difficult to ascertain from the complaint, but also "are typically factual inquiries that should not be decided on a motion to dismiss[.]" *LBBW Luxemburg S.A. v. Wells Fargo Securities LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014).

## 2.  Justifiable Reliance

Defendants argue that the Amended Complaint lacks facts indicating that Aboutaam justifiably relied on El Assaad's allegedly fraudulent representations that he planned to develop and sell real estate properties in the south of France. (ECF No. 41 at 12). In support of this argument, Defendants argue that Plaintiff admitted to having no real estate investment experience or experience in selling real estate and to knowing that construction had not begun on the French Development. (*Id.* (citing Am. Compl. at ¶¶ 23, 37–39)). They argue that the Amended Complaint offers no indication as to Aboutaam's use of the LLC. (*Id.*).

"As an essential element of a cause of action for fraud, ... [justifiable] reliance must be pleaded with particularity pursuant to [Federal Rule of Civil Procedure] 9(b)." *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 230 (S.D.N.Y. 2005) (internal quotation marks omitted) (alterations in original).

"[I]n order adequately to allege a claim for fraud under New York common law, a plaintiff must plead facts tending to show that her reliance on the defendant's misrepresentation was

reasonable." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 496

(S.D.N.Y. 2012). Courts assess the reasonableness of a plaintiff's reliance through consideration

of "the entire context of the transaction, including factors such as its complexity and magnitude,

the sophistication of the parties, and the content of any agreements between them." *Emergent*

*Capital,* 343 F.3d at 195. "A plaintiff must also allege that such reliance was to its detriment, *i.e.*,

"that the misrepresentations directly caused the loss about which plaintiff complains (loss

causation)." *DoubleLine Capital LP v. Obrecht Fin. Ltd.*, 323 F. Supp. 3d 393, 461 (S.D.N.Y.

2018) (quoting *Meyercord v. Curry*, 832 N.Y.S.2d 29, 30 (1st Dep't 2007) (citation omitted)).

    Drawing all reasonable inferences in favor of Aboutaam, I find that he has plausibly alleged

that El Hassaad made a deceptive statement that he reasonably relied on to his detriment.

Defendants' arguments about Plaintiff's lack of real estate experience support this conclusion.

Plaintiff, while not an unsophisticated business person, is, by Defendants' own admission not

knowledgeable about the real estate market or construction. Further, Plaintiff had no indication at

the time that El Assaad was lying about owning the properties in France. El Assaad took Plaintiff

on a tour of these properties with individuals who appeared to be legitimate real estate brokers.

This alleged, elaborate staging accompanying El Assaad's alleged falsehood mitigates the fact

that Plaintiff could have, but did not do all his due diligence by investigating whether El Assaad

held the titles to these plots. The weight of that mitigation as well as the extent to which El

Assaad should have been expected to investigate, are inquiries more appropriate for a factfinder

than for a court at the motion to dismiss stage. *See Fed, Hous. Fin, Agency*, 902 F. Sup. 2d at 496

("Moreover, because justifiable reliance involve[s] many factors to consider and balance, no

single one of which is dispositive, it is often a question of fact for the jury rather than a question

of law for the court.") (internal quotation marks and citation omitted). Additionally, "even a

sophisticated party may rely on the representations of another where the facts misrepresented were 'peculiarly within the Defendants' knowledge.'" *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) (quoting *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.,* No. 03 Civ. 3748, 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) (quotation marks omitted)).

### 3. Personal Jurisdiction

Defendants argue that Count III must be dismissed because El Assaad failed to plead facts sufficient to establish this Court's personal jurisdiction over El Assaad with respect to this claim.

### a. Legal Standard

In this case, Plaintiff does not argue that the Court has general jurisdiction over El Hassaad with respect to this claim, and I agree that the Court does not. With that, I consider whether the Court has specific personal jurisdiction over El Hassaad.

New York's long-arm statute provides that New York courts:

> may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent:
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
> 4. owns, uses or possesses any real property situated within the state.

N.Y.C.P.L.R. § 302(a).

Aboutaam argues the Court has jurisdiction over El Hassaad in this claim pursuant to C.P.L.R. § 302(a)(3) because El Hassaad is alleged to have committed a tortious act outside of New York, which caused injury to Aboutaam within the state. (ECF No. 72 at 19). In his Motion

to Dismiss, El Hassaad argues that Aboutaam did not allege facts, fsandsthat if true, would prove

he sustained injury in New York. (ECF No.41 at 23–24). El Assaad contends that "[t]he situs of

the injury is the location of the original event which caused the injury, not the location where the

resultant damages are felt by the plaintiff." (*Id.* at 23 (quoting *Whitaker v. American Telecasting,*

*Inc.*, 261 F.3d 196, 209 (2d Cir. 2001). Because the events or tortious acts that caused injury—El

Assaad's alleged misrepresentations about his plans to develop in France—were made outside

New York, in France and Canada, the injury sustained by Aboutaam is in these foreign countries

as well. (*Id.* at 23–24).

However, as Plaintiff correctly counters, the injury rule is modified in fraud cases. "In a

case involving fraud, 'the critical question is [] where the first effect of the tort was located that

ultimately produced the final economic injury.'" *Sands Harbor Marina Corp. v. Wells Fargo Ins.*

*Servs. Of Oregon, Inc.*, 156 F. Supp. 3d 348, 357 (E.D.N.Y. 2016) (quoting *Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 792 (2d Cir. 1999)). In this case, the

first effect of El Assaad's misstatements or fraud was felt in New York, where Aboutaam first

spent money on the real estate company by signing a lease for office space in New York. *See*

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 395–96 (S.D.N.Y.

2002) ("In the case of fraud, the critical question is ... where the first effect of the tort was

located that ultimately produced the final economic injury, and the law of this Circuit is that

plaintiff's reliance in New York on defendant's misrepresentations [transmitted from outside the

state] fixes the situs of the injury in New York.") (internal quotation marks omitted) (alterations

in original).

## II. Second Fraud Claim

Defendants argue that Plaintiff's second cause of action for fraudulent inducement should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for three reasons: (1) the text of the Sale Agreement Plaintiff signed confirms that Plaintiff was fully knowledge about the location of the townhouse; (2) Plaintiff had the means available to investigate the location of the Townhouse before he purchased it; and (3) Plaintiff waived any claim for rescission as he affirmed the Sales Agreement after he alleges to have discovered the Townhouse's actual location.(ECF No. 43 at 18).

To state a claim for fraudulent inducement under New York law, a plaintiff must allege: "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017) (quoting *Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001)).

Defendants do not specify which elements of fraudulent inducement Plaintiff failed to allege. I understand their arguments to go towards reliance. Where a "contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993). However, "to bar a fraud claim, a merger clause" or disclaimer clause "must address 'the very matter as to which [the party] now claims it was defrauded.'" *PetEdge*, 234 F. Supp. 3d at 488 (quoting *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F.Supp.2d 100, 112 (E.D.N.Y. 2009) (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959).

The clause the Defendants cite does not fit the bill. In fact, it does not qualify as a merger or waiver clause at all. All the statement provides is that Plaintiff looked at maps and designs and

engineering specifications of the property. It does not supersede prior representations El Hassaad made about the property or even stipulate that Plaintiff, from this minimal review, agrees he knows what the townhouse or surrounding property looks like. The statement is not even tangentially related to Plaintiff's allegation that El Hassaad told him he had exclusive development rights for surrounding property. Plaintiff's review of maps and engineering specs would not have addressed his reliance on this alleged misstatement.

Defendants' second argument also goes to reliance. They argue that because Plaintiff had the availability to verify the relevant statements about the townhouse made by El Hasaad, and neglected to acquire this knowledge, it was unreasonable for Plaintiff to rely on the alleged misstatements. (ECF No. 72 at 27–28). Defendants are correct that:

> [I]f the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation ,[the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations.

*De Sole v. Knoedler Gallery, LLC,* 139 F. Supp. 3d 618, 642 (S.D.N.Y. 2015) (quoting *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.,* 25 N.Y.3d 1043, 1044 (2015) (quoting *Schumaker v. Mather,* 133 N.Y. 590, 596 (1892)) (alterations in original). However, "the obligation to [make use of the means of verification] must be understood as contingent on either *indisputable* access to truth-revealing information…or some suspicious event or information triggering the duty to inquire." *De Sole*, 139 F. Supp. at 642 (internal quotation marks omitted) (emphasis and alteration in originsl).

Aboutaam had no hints of the alleged falsity of El Hassaad's statements. He had no reason to find these statements suspect. El Hassaad allegedly went out of his way to convince Aboutaam that the townhouse had the view and the location promised. As Aboutaam alleged, El

Assaad took aerial photos of the property, angled carefully to deceive Aboutaam, he "prepared large binders with colorful detailed brochures, blueprints and other marketing materials." (Am. Compl. at ¶ 27). These detailed representations provided no reason for Aboutaam to be suspect.

"As a general matter, dismissals for failure to allege reasonable reliance are heavily disfavored. As the Second Circuit has explained, 'the reasonableness of a plaintiff's reliance is a "nettlesome" and "fact-intensive" question, which we, like our Circuit's many district courts, will not lightly dispose of at the motion-to-dismiss stage.' " *Wild Bunch, SA v. Vendian Entertainment, LLC*, 256 F. Supp. 3d 497, 507 (S.D.N.Y. 2017) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997)).  This too is a situation where the question of reasonable reliance is better left to a fact-finder.

Defendants' final argument is that Aboutaam ratified the Sale Agreement by continuing to perform under it after he allegedly discovered El Assaad had not been truthful about the townhouse. (ECF No. 41 at 14–15). Defendants misunderstand Aboutaam's claim. Aboutaam does not argue that the Sales Agreement was not a contract. He alleges he was fraudulently induced into entering into the contract and he seeks damages arising from the fraud. Ratification is not a defense to fraudulent inducement. *See Petrello v. White*, 412 F. Supp. 2d 215, 227 (E.D.N.Y. 2006) (Plaintiff "would be entitled to damages arising from fraud if he could prove that such fraud in the inducement occurred and that he was damaged thereby.")

### III. Settlement Agreement Claims

Defendants argue that Plaintiff's fourth and fifth claims must be dismissed because they can be adjudicated only in a Lebanese court. (ECF No. 41 at 20). In turn, Plaintiff argues that he is entitled to summary judgment on these claims. (ECF No. 71).

In support of their motion to dismiss, Defendants submitted a translated copy of the Lebanese Townhouse Sale Agreement to the Court. (ECF No. 44-1). Plaintiff does not dispute that this document is, in fact, the Sale Agreement, or that it is an accurate translation of the same. Article Nine of the Agreement provides: "Courts of Beirut shall look into any dispute, or claim that may rise from the interpretation, application, execution, or termination of this Agreement." (ECF No. 44-1 at 6). Defendants argue that Plaintiff's claims "rise from" the termination of the Sale Agreement and therefore are covered by this forum selection clause, which Defendants contend is mandatory.

Plaintiff argues that the Sale Agreement is not the relevant contract. According to Plaintiff, at issue is the separate agreement the parties made over WhatsApp on June 18 to resolve their dispute over the Magnolia apartment. Through that agreement, El Assaad was obligated to pay Aboutaam $800,000. El Assaad breached that agreement by not paying Aboutaam.

The Second Circuit has provided a four-part test for determining whether dismissal of a claim based on a forum selection clause is appropriate. *See* S*.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 708 (2d Cir. 2010).

> Under this analysis, the Court must: (1) determine whether the clause at issue was reasonably communicated to the party resisting enforcement; (2) determine whether the clause is mandatory or permissive; (3) determine whether the clause covers the claims and parties involved in this action; and (4) as satisfaction of the first three steps creates a presumption of enforceability, the Court must determine whether the resisting party has rebutted the presumption by demonstrating "that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Prod. Res. Grp. v. Martin Prof'l*, 907 F. Supp. 2d 401, 408 (S.D.N.Y. 2012) (quoting *Id.* at 708, 711).

24

To resolve Plaintiff's motion for partial summary judgment and this segment of Defendants' motion to dismiss, I must decide whether the forum selection clause in the Sale Agreement is mandatory or permissive and whether the clause covers the parties and claims in this action. As to the latter question, I specifically must ascertain whether the parties' settlement agreement, which terminated the Sale Agreement, can be interpreted as a separate contract or instead, whether it is covered by the terms of the parties' original Sale Agreement. However, these questions must be decided pursuant to Lebanese, not New York law, because Lebanon is the center of gravity of this contract. *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (interpreting a contract in a diversity action requires applying the law of the jurisdiction which is the center of gravity of that contract).

In their briefing, Defendants argue generally that Lebanese law requires any disputes concerning the Sale Agreement be litigated in Lebanon. (ECF No. 43 at 21–22). However, neither party briefed Lebanese contract law or specifically how Lebanese courts would interpret the forum selection clause or understand the relationship between the original Sales Agreement's "rise from" language and this allegedly separate settlement agreement.

Defendants' motion to dismiss Counts four and five, and Plaintiff's motion for partial summary judgment on the same are denied without prejudice so the parties may brief these issues.

## CONCLUSION

Defendants' motion to dismiss with respect to Counts One, Two, and Three is DENIED with prejudice. Defendants' motion to dismiss with respect to Counts Four and Five is DENIED without prejudice. Plaintiff's motion for partial summary judgment on Counts Four and Five is DENIED without prejudice

**SO ORDERED.**

**Dated:**  March 31, 2020

                **New York, New York**

                                        **ANDREW L. CARTER, JR.**

                                        **United States District Judge**